THE STATE v. J. W. MAJORS, Appellant.—44 S. W. (2d) 163.

Division Two, December 1, 1931.

*McKay, Peal & Corbett* and *Sharp & Baynes* for appellant.

*Stratton Shartel*, Attorney-General, and *Carl J. Otto*, Assistant Attorney-General, for respondent.

COOLEY, C.—By information filed in the Circuit Court of Pemiscot County defendant was charged with murder in the first degree for shooting and killing his wife. A change of venue was awarded to the Circuit Court of New Madrid County, where the cause was tried, resulting in defendant's conviction of murder in the second degree. He was duly sentenced pursuant to the verdict of the jury to fifteen years' imprisonment in the penitentiary, and has appealed. The State's evidence tended to prove the following:

The shooting occurred at the home of defendant and his wife in Pemiscot County on September 10, 1928. On the afternoon of that day Mrs. Majors was found in her home mortally wounded with two bullet wounds in her abdomen. Either wound would have caused death. There were also some scratches and minor bruises about her neck. She was removed to a neighbor's house, and thence to a hospital, where she died the next morning. Upon discovery of the crime a deputy sheriff was called. He found a trail leading away from defendant's house through a cornfield back of the house, the trail indicating that the person making it had first crawled on hands and knees. The officer followed the tracks of that person to a place where he learned that the defendant had surrendered himself. After taking custody of defendant he asked the latter: "What got the matter with you all?" To which defendant replied: "We fell out about some chickens."

There was evidence tending to prove that some four days prior to the shooting Mrs. Majors had missed some chickens, which defendant said he had sold, and that she and defendant had quarreled about it. He had made some threats against her at that time, but the witness who gave the testimony could not remember what the threats were. There was also testimony from another witness to the effect that about the last of March, 1928, the defendant had tried, unsuccessfully, to procure a gun from the witness "to kill his wife with." Another witness testified that a "short time" before the shooting defendant came to witness's store and "wanted to buy a gun from me." He was not permitted to state what, if anything, defendant said as to why he wanted the gun.

Witness T. V. Schoonover testified to a dying declaration of Mrs. Majors, the foundation for such testimony having first been laid by an examination before the court in the absence of the jury. Mrs. Majors when she made the statement in question was lying on a table, bleeding profusely, and was very weak. She would speak a few words, then pause and close her eyes, then speak again and so continue. She said she would not get well, she would die before morning. After expressing that belief of her impending death she made the statement which was offered as a dying declaration, in substance as follows: That she had gone to a Mr. Rankin's that day and

when she returned she found her chickens were gone; that defendant had taken them to Pendergrass's store and she went down there and identified them; that (quoting the witness) "she told him [defendant] she wouldn't put up with that kind of stuff. She put on her dress and got ready to leave and he told her she couldn't leave him in that kind of a mess—she started to leave, to go out the door, and Majors grabbed her, choked her, kicked her and shot her in the stomach."

That statement was made about 7:30 P. M., on September 10, and Mrs. Majors died before nine o'clock the next morning.

Sam Stephens testified that in a conversation in which she said she could not get well, Mrs. Majors "told me she said she was going to leave him (defendant) and he said he would kill her before he would let her leave him in that mess." Q. What did she next say? A. She said he shot her.

Defendant relied upon self-defense. After giving his age as forty-eight and stating in answer to a question that he shot deceased, he testified in substance as follows: We were fixing to move, I had sold some chickens and she (Mrs. Majors) kept rearing all of the time about the chickens and fussing. We were fixing to move and it was hard times and we needed the money. It was before cotton picking and she kept growling about the chickens. We were back there packing up and we had taken down one of the beds and left one sitting in the corner and I was taking down a picture between the bed and the wall—I looked around and she was coming in with an axe and had it drawn on me—I said: "What are you going to do?" And she said: "I am going to end your life—" She looked like she was awful mad.

He further testified that after he shot his wife she dropped the axe, which he threw out on the wood pile, and that he went through the field but not on his hands and knees to a neighbor's house where he asked that "the law" be called for his protection; that when his wife became angry "she just got mad and she wanted to tear up the place and fight;" that she had "tried to poison us all," and did poison the cow, and had burned the barn and four mules. He denied having made threats or having tried to procure a gun. He introduced evidence tending to prove his own good character and Mrs. Majors' bad reputation as a violent and turbulent woman when angry.

I. In his motion for new trial defendant for the first time challenged the information on the grounds that it did not charge him with the violation of any law and is "too indefinite and uncertain and does not inform the defendant of the nature of the charge he is required to meet." In his brief here

the only explanation of that challenge of the information is this: the information alleges in the usual form an assault made by defendant upon Mrs. Majors with a pistol loaded with gunpowder and *leaden* balls, which it is alleged he feloniously, etc., discharged "to, against and upon the said Mrs. J. W. Majors and that the said J. W. Majors with the *metal* balls aforesaid, out of the revolving pistol aforesaid, then and there by force of the gunpowder and leaden balls aforesaid . . . then and there feloniously . . . did strike, penetrate and wound her the said Mrs. J. W. Majors," etc. (Italics ours.) The contention seems to be that the information is rendered so vague and indefinite as to be insufficient, even after verdict, because it is first alleged that the pistol was loaded with leaden balls and when the missiles with which defendant struck deceased are next referred to they are described as metal balls. This objection to the information is hypercritical and without merit. Lead is a metal, so if the missiles were leaden balls they were metal balls. The phrase "metal balls aforesaid" could only be understood to mean the leaden balls previously mentioned in the information.

We considered and decided adversely to the defendant a somewhat similar contention in State v. Wilson, 34 S. W. (2d) 98, in which case the information charged that the pistol used was loaded with a leaden bullet and the proof failed to show of what substance the bullet was composed. Except in the respect above referred to the information follows the form that has often been approved by this court. No other alleged defect in it is pointed out. It is sufficient.

II. Error is assigned in that the State failed to prove "the place of death of deceased as alleged in the information and thereby failed to make out its case against the defendant." The information alleged that the mortal wounds were inflicted in Pemiscot County, Missouri, and that deceased died in Mississippi County, Arkansas. The proof did not show where Mrs. Majors died.

So far as jurisdiction of the offense is concerned no question can arise. By statute, Section 3381, Revised Statutes 1929, if a mortal wound is inflicted upon a person in this State and such person dies thereof in another state the offender may be indicted, tried and convicted in the county in which the mortal wound was inflicted, "in all respects as if the death had happened in such county." So, also, by Section 3380, Revised Statutes 1929, if the mortal wound is inflicted in one county and the death occurs in another county of this State. It is immaterial, therefore, and need not be alleged where the death occurred, so far as concerns jurisdiction of the cause.

If it be contended that the place of the death was a substantive fact necessary to be alleged as a constitutive part of the charge and

in order that defendant might be informed of the nature and cause of the accusation, such contention is answered adversely to defendant in State v. Borders (Mo. Sup.), 199 S. W. 180, in which case the information failed to allege where the deceased died and was challenged as insufficient for that reason. In a well considered opinion this court held that such omitted allegation was not of a substantive fact necessary to be alleged and proved, distinguishing several earlier decisions. In the opinion it is said:

"Of what avail would it have been to defendant either in the preparation or in the making of his defense if the place of the death of his victim had been stated, or, if stated, had been shown to be incorrect? Constituting no defense, it was not a substantive fact and its averment was unnecessary. This accords with reason and finds ample support in that portion of our Statute of Jeofails, Section 5115, Revised Statutes 1909 (Sec. 3563, R. S. 1929), which renders it unnecessary to aver any fact not necessary to be proved, if sufficient matter is alleged to indicate the crime and the person charged."

Since. the place where the death occurred is not a substantive fact that must be alleged and proved we are unable to see why, if it is needlessly alleged but not proved, such failure to prove it should defeat the case. We hold that proof of the place where deceased died was not necessary to make out the State's case.

III. In his motion for new trial defendant assigns error in the admission of the testimony of T. V. Schoonover, thus: "The court erred in admitting, over the objection and exception of the defendant at the time, the testimony of the witness T. V. Schoonover as fully set out and shown by Exhibit 'A' hereto attached, and made a part of this motion." The further allegation is made that the court erred in permitting witness Stephens to testify that Mrs. Majors said, as part of a dying declaration, that "she had gone down to Mr. Pendergrass's and identified her guilt (quilt?) tops and chickens, because such statement was not and could not be part of the dying declaration, and was hearsay evidence."

No point is made in the motion for new trial that a sufficient foundation was not laid for the introduction of a dying declaration if the matter contained in the statement was otherwise competent as a dying declaration, and we shall not discuss the question from that angle further than to say that we think it was sufficiently shown that the statement testified to as having been made by Mrs. Majors was made in the belief on her part, justified by her then condition and the event, that she was about to die.

Exhibit A showing Schoonover's testimony, which is referred to in the above quotation and was attached to the motion for new trial as shown in the bill of exceptions, consists of eight typewritten pages and is merely a transcript of his entire testimony including that given when he was recalled for further examination by the State and again by defendant for further cross-examination and to give affirmative testimony in behalf of defendant, and including also the witness's examination before the court in the absence of the jury in laying the foundation for his testimony to the jury relative to the dying declaration. In the examination before the court there were objections made by the defendant and overruled by the court, to which exceptions were saved. Schoonover testified to some facts other than the dying declaration. The motion for new trial challenges generally his whole testimony, without attempting to point out with particularity, or at all, the portions thereof to which defendant desired to direct the court's attention or to indicate the reasons for which he claimed the evidence had been improperly admitted. We have repeatedly held that such general and sweeping allegation in a motion for new trial is not sufficient to present anything for review. As well say in the motion that the court erred in admitting over the objections of the defendant all of the testimony of each of the witnesses.

Relative to the testimony of witness Stephens the motion sufficiently points out the testimony complained of, but the trouble with this assignment is that, as shown by the bill of exceptions, Stephens did not testify to such alleged statement of Mrs. Majors. We have set out above the substance of Stephens's testimony. The testimony complained of, so far as given at all, was given by Schoonover. Defendant may have inadvertently referred in his motion to the witness Stephens as having given that testimony when he meant to refer to Schoonover. However, though the reference is inaccurate, the testimony complained of is indicated and we have concluded to consider this assignment of error as though it had been properly preserved.

The rule in regard to the subject-matter of dying declarations is that "they should be restricted to the identification of the accused, the act of killing and the circumstances immediately attending the act, forming a part of the *res gestae.*" [State v. Peak, 292 Mo. 249, 259, 237 S. W. 466.] See also State v. Garrison, 147 Mo. 548, 553, 49 S. W. 508; State v. Colvin, 226 Mo. 446, 482, 126 S. W. 448; State v. Clift, 285 S. W. 706. Under the foregoing authorities and many others the part of the statement in which Mrs. Majors is alleged to have said that she told the defendant "she wouldn't put up with that kind of stuff," and her relation of what followed was competent.

It all occurred at the time and in immediate connection with the shooting, was not a statement of conclusions, and the matters embraced therein were part of the *res gestae.*

No objection is urged as to the reference by Mrs. Majors to having gone that day to Mr. Rankin's. There was nothing in the statement as detailed to the jury referring to quilt tops. There was such reference in the witness's testimony to the court while the foundation was being laid for introducing proof of the dying statement, but the jury did not hear that.

That leaves for consideration only the part of the testimony to the effect that Mrs. Majors said that defendant had taken the chickens to Pendergrass's store and that she had gone there and identified them. We are inclined to think that the last mentioned part of the statement, being a narration of a past event not immediately connected with the shooting, was not competent as part of a dying declaration. But we are convinced that it could not possibly have been prejudicial to defendant because he voluntarily, in his own testimony in chief, testified in substance and effect to the same thing so far as the fact involved could have any bearing upon the case or any effect in the consideration of the jury. Defendant argues that the testimony in question might have given the jury the impression that he had sold deceased's chickens "without any cause and because she remonstrated he shot her." He testified that he had sold them and that she "kept rearing all the time, about the chickens and fussing . . . She kept growling about the chickens." Even if the fact that defendant had sold the chickens and that deceased was displeased or remonstrated with him about it could in any event have been prejudicial to defendant, it could not be so when he admitted and voluntarily testified to the same fact himself. We therefore rule this point against the defendant.

IV. It is claimed that the evidence was insufficient to sustain the verdict. The point is not discussed in appellant's brief. The bare statement is made with no reasons given. We apprehend from the next point made in the brief that what appellant meant by this assignment was that the evidence was insufficient because the place where Mrs. Majors died was not proved—a contention which we have disposed of. Considering the clearly admissible part of the dying statement along with other facts and circumstances proved by the State, there can be no doubt of the sufficiency of the evidence. Moreover, defendant admitted that he killed his wife with a deadly weapon intentionally used by him upon a vital part of her body, from which, nothing else appear-

ing, a presumption of murder in the second degree would arise. The jury may not have believed that part of defendant's testimony tending to show self-defense. [State v. Eason, 18 S. W. (2d) 71, 77.]

V. The verdict is challenged in the motion for new trial as being insufficient in form and as not conforming to the charge in the information. The point is not briefed. We notice the verdict, it being part of the record proper. It was as follows:

"We the jury find the defendant guilty of 2nd degree murder as charged and assess his punishment at Fifteen years in the State Penitentiary. Robert Turner, foreman."

Murder in the second degree is included in a charge of murder in the first degree. The verdict is responsive to the charge. It would be in better form had the word "imprisonment" been used preceding the words "in the State Penitentiary," but its meaning is unmistakable and it is sufficient. The judgment is in due form.

We find no reversible error in the record. The judgment of the circuit court is accordingly affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.