STATE of Missouri, Respondent,

v.

Ruben ANDERSON, Appellant.

No. 49703.

Supreme Court of Missouri,

En Banc.

Nov. 9, 1964.

Rehearing Denied Dec. 14, 1964.

Thomas F. Eagleton, Atty. Gen., Howard L. McFadden, Asst. Atty. Gen., Jefferson City, for respondent.

Claude Hanks, Clayton, for appellant.

HOLMAN, Judge.

The indictment in this case charged defendant, Ruben Anderson, and Willie Reed, Jr., with the first degree murder of Anthony J. Schlader on March 19, 1962. They were alleged to have beaten him with a certain iron pipe thus inflicting a mortal wound from which he died. A severance was granted and upon the trial of defendant the jury found him guilty of murder in the first degree and the death penalty was assessed. See §§ 559.010, 559.030 (all statutory references are to RSMo 1959, V.A.M.S.). Defendant has duly appealed from the ensuing judgment and sentence. His case was briefed and argued here by appointed counsel who was not the attorney who represented him in the trial court.

There was very little conflict in the evidence. The defendant did not testify except at a hearing outside the presence of the jury on the issue of the voluntary nature of his confession. He offered no evidence before the jury except the brief testimony of his mother upon a rather unimportant fact detail.

The evidence offered by the State will support the following statement: On the evening of March 19, 1962, defendant drove a 1950 Plymouth automobile which was registered in the name of Anthony J. Schlader and which displayed Missouri license number "KB3–549," from St. Louis, Missouri, to Carlyle, Illinois. He was accompanied by two other Negro men, Willie Reed and Pinky White. Defendant had formerly worked in Carlyle and was acquainted with some of the people who resided there. There were a number of new framed religious pictures in the automobile which defendant endeavored to sell to acquaintances in Carlyle. He sold three of the pictures to Gene Lowe for $5. Edna Lowe also purchased one picture for $2.

Defendant then contacted Oliver Koehler, a filling station operator, and tried to sell him a picture. He first asked $3 for it, then reduced the price to $2, and finally to $1, but Koehler did not buy it. Koehler's nephew, Richard Koehler, was a policeman in Carlyle and observed the defendant talking with his uncle. After defendant and his companions left the filling station on their return trip to St. Louis, Richard questioned his uncle about the car and its occupants and then started in pursuit of the automobile defendant was driving. He broadcast a bulletin requesting that other officers in the area stop the car and "check it out." Some time later the automobile was stopped by three Illinois State Troopers. After searching the three men for weapons they opened the trunk of the automobile, with the consent of the three men, and there found ten boxes, each of which contained one of the religious pictures heretofore mentioned.

The men were taken to French Village police headquarters. There defendant handed the officers a set of keys which included a key to the automobile and a miniature license plate tag showing the same number as the license plate on the Plymouth. At the direction of the officers the men emptied their pockets and the contents included a cigarette lighter in the possession of defendant which was later identified as one belonging to the deceased. Willie Reed was wearing a topcoat which was later identified as belonging to deceased. Because it was suspected that defendant was guilty of the interstate transportation of a stolen vehicle, an FBI agent, Joseph L. McKinstray, of Belleville, Illinois, was called to the police station. He arrived about one o'clock a. m. and proceeded to question the three men. At first, defendant told McKinstray that he and a companion had stolen the Plymouth in St. Louis earlier that evening. Later, upon being questioned concerning his knowledge of the owner of the car, defendant told McKinstray that the owner was in the basement of his mother's house on Windsor Place in St. Louis. He

then detailed the manner in which he and a companion had killed Mr. Schlader and had attempted to dispose of the body by putting it in the furnace at 3852 Windsor in St. Louis.

In an effort to avoid duplication we will not set forth the oral statement given by defendant to McKinstray for the reason that defendant, later that day, gave a detailed written confession to the officers in St. Louis. We will hereinafter summarize that written statement and point out any conflicts existing between the oral and written statements.

At about 7 a. m. on March 20, St. Louis police officers who had been called to the French Village station returned defendant, Reed, and White to St. Louis where they were "booked" and taken to the offices of the homicide section of the St. Louis Police Department. Upon arrival there a wrist watch, later identified as the property of deceased, was found in the lining of the coat worn by Pinky White. At that time the men were questioned by Robert Koster, an assistant circuit attorney. He testified that from eight until ten o'clock he was engaged in questioning Reed and White. At ten o'clock he started questioning defendant, and, after about 45 minutes of questioning, a stenographer was called in and a written statement in question and answer form was taken from the defendant which was later typed by the stenographer and read and signed by defendant. The following is a summary of that written statement:

Preliminarily, defendant stated that no threats or promises had been made, he had not been mistreated, and he gave the statement of his own free will, knowing that it coud be used against him. He stated that on March 12, 1962, he was at his mother's apartment at 3852 Windsor Place; that Pinky White was also there, and Willie Reed was at his house next door; that a man (later identified as Mr. Schlader) came to the apartment selling religious pictures and sold one to defendant on credit;

that Mr. Schlader was supposed to come back each Monday or Tuesday and collect the payments; that between March 12 and March 19 he, White, and Reed discussed robbing Mr. Schlader, and "talked about it all the time" ; that they planned that when he came to the apartment again they would "take his money, beat him up, just do anything so we can get his money so we can go to California"; that they talked about using a knife and an iron pipe, but "I decided on an iron pipe"; that the three of them decided to meet at his mother's house on Monday morning, the 19th, at about 9:30; that Reed arrived on time and the two of them sat in the living room, each holding an iron pipe, and watched for Mr. Schlader through the window; that when Schlader arrived he opened the door and invited him in; that a dog in the apartment jumped at Schlader and he put the dog in another room; that when he came back Mr. Schlader was standing there and Reed ran out; that he then hit Schlader on the side of his face and head with the pipe and he fell down; that after deceased was on the floor he struck him a number of times with the pipe and also with his fists; that he then took Schlader's wallet and carried him to the basement steps and slid him down the steps into the basement; that he then drug him over near the furnace and laid him on a trunk; that at that time Reed knocked on the door and he let him in and they returned to the basement; that he then took a ring off the man's finger, which he later that day pawned at Sam Light's Pawn Shop for $2, and Reed took Schlader's wrist watch; that they then stuffed Mr. Schlader's body into the furnace after Reed had torn most of his clothes off looking for money; that at Reed's direction he went upstairs and got the oil can; that at that time Pinky White came to the door and wanted to speak with Reed and the two of them left together. Defendant stated that he returned to the basement and poured oil on the body and lit the fire. He then went upstairs and changed clothes and put the clothes he had taken off into the furnace;

that he then looked in the wallet he had taken from Mr. Schlader and found $8.20, and later found $74 in a secret compartment of the billfold; that he then left the house and went up the street to a crap game where he lost all of the money he had taken from the wallet; that he had found a cigarette lighter and a set of keys on the floor where deceased had fallen and the keys had a miniature license tag with the number "Mo. KB3–549" thereon; that about 7:30 that evening he, Reed, and White started a search of the neighborhood for a car bearing the license number on the miniature tag; that he found the car and then picked up Reed and White and started to the home of Thelma Thrice; that on the way they had a flat tire and in changing the tire they opened the trunk and found the boxes of religious pictures, one of which they gave to Thelma; that they then went over in East St. Louis "joy riding" and later drove to Carlyle, Illinois, where they sold some of the pictures; that they started back to St. Louis and were arrested by the highway patrol.

The oral statement made by defendant to McKinstray differed from the written statement, primarily in the manner in which the decedent was killed. McKinstray stated that defendant said he was not actually present when the first blow was struck because he was "handling the dog"; that his friend struck the first blow and then ran out of the house; that he, defendant, heard the body hit the floor and when he returned to the room "the man was making no move or no sound, but had a funny look on his face. Ruben said he then, with his left hand struck the man in the face with his left fist, holding a piece of pipe in his hand. I asked him about the pipe. He said it was an iron pipe, about eighteen inches long, and about an inch to an inch and a half in diameter, and at that time he showed me a small cut or contusion on his left thumb he said he got at that time striking the blow, and also said his whole hand was still sore; * * * that about this time his companion

returned and together they dragged the man to the stairway to the basement. * * *"

After the oral confession the St. Louis police went to defendant's mother's apartment and found the body in the furnace. It was later removed to City Hospital No. 1 where it was examined by an intern and found to contain no life. An autopsy was performed by Dr. Durand Benjamin who stated that because of the burned condition of the body he could only examine the skull; but that he obtained a sample of blood from the skull which was sent to the laboratory for a carbon monoxide test. He stated that there was a six-inch fracture in the back portion of the skull and the inner table was knocked out into the interior of the skull with resulting brain damage and a subdural hemorrhage; that in his opinion the fracture of the skull caused the death of Mr. Schlader.

William Secunda, a chemist and toxicologist, testified that he examined the sample of blood which had been taken from the skull of deceased and found that the carbon monoxide content was from 5 to 7% saturation and that the minimum amount of carbon monoxide required to cause death is 40% saturation. (Because of this test it was assumed throughout the trial that Mr. Schlader was dead before his body was placed in the furnace.)

John Bendick, of the Hoppe Funeral Home, testified that he went to 3852 Windsor with Stanley Thompson and obtained the body of deceased after the furnace had been dismantled; that in the furnace they found a pair of broken glasses, the remains of a hat, a portion of a shirt, and some papers and a pad book, as well as certain other items.

Mrs. Schlader, widow of deceased, testified that she last saw her husband alive the evening of March 18. She identified the wrist watch, the keys, and the cigarette lighter taken from defendant and his associates as the property of her husband. She also identified the pair of glasses, a

part of a suspender, and a partially burned piece of a truss taken from the furnace as items belonging to her husband.

Additional facts will be stated in connection with our discussion of the points briefed by defendant.

 There are fifty assignments in defendant's motion for new trial. All of said assignments are referred to by number in defendant's brief and related assignments are grouped together therein for convenience of discussion and argument. We note, however, that no contention of error is advanced in the brief concerning some of the assignments in the motion and they are considered as abandoned. S.C.Rule 28.02, V.A.M.R.; State v. Reese, 364 Mo. 1221, 274 S.W.2d 304 [1].

We will first consider defendant's contention that the trial court erred in overruling his motion for a bill of particulars. In that motion defendant sought an order compelling the State to give (1) a description of the pipe, (2) a statement of the place on Schlader's body which was beaten, (3) how the assault was made, (4) the place where the mortal wound was inflicted, and other similar information.

 This court has stated that "the bill of particulars authorized by S.Ct. Rule 24.03 is not to be used for the purpose of making the State reveal the details of the evidence upon which it seeks to establish its case. The function of such a bill is limited to that of informing the defendant of the particulars of the offense *sufficiently to prepare his defense.*" State v. Mace, Mo.Sup., 357 S.W.2d 923, 926. We have also said that "[t]he motion for a bill of particulars is addressed to the sound discretion of the trial court and its ruling thereon should not be disturbed in the absence of an abuse of such discretion." State v. Cox, Mo.Sup., 352 S.W.2d 665, 672. The indictment alleged that the defendant (and his co-defendant) "feloniously, wilfully, premeditatedly, deliberately, on purpose, and of their malice aforethought did make an as-

sault upon one Anthony J. Schlader with a certain iron pipe and then and there feloniously, wilfully, premeditatedly, deliberately, on purpose, and of their malice aforethought did strike, beat and wound at and upon the body of the said Anthony J. Schlader, with the aforesaid iron pipe, thereby feloniously inflicting a mortal wound * * *." That is not a complicated charge such as one might encounter in a prosecution for violation of the antitrust laws or similar offenses. Here, the indictment simply charges that defendant murdered Schlader by beating him with an iron pipe. That would seem to be all of the information defendant would need to prepare his defense. Moreover, the State apparently did not have the iron pipe (it was not offered in evidence) and could not give a more definite description of it. The information the State possessed as to the manner in which the crime was committed was contained in defendant's confession and his attorney was permitted to read it well in advance of the trial. Under the circumstances of this case we rule that the court did not abuse its discretion in overruling the motion for a bill of particulars.

Defendant also contends that the court erred in overruling his motion to dismiss the indictment which was based upon the ground that "the term 'murder' as found in Section 559.010 * * * is not defined except as to a homicide committed in perpetration of a named felony." He says that the present indictment does not charge a homicide committed in the perpetration of a designated felony and that "the term 'murder' as used in the indictment being undefined in the Statutes of the State of Missouri, fails to properly advise the defendant of the nature of the charge against him and, therefore, the indictment should have been dismissed."

 It is true that the defendant in a criminal cause "has a constitutional right to demand the nature and cause of the accusation against him, and a criminal statute must be sufficiently clear that there can be

no doubt as to when such statute is being violated." State v. Kornegger, 363 Mo. 968, 255 S.W.2d 765, 767. The statute under which defendant was charged is § 559.010 which provides that "[e]very murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree." The word "murder" as used in the first part of the statute was obviously intended as synonymous with the word "homicide" which has been defined as "a killing of a human being through human agency * * *." Webster's Third New International Dictionary. In this connection it should be pointed out that defendant was not charged with *murder* but with the statutory offense of *murder in the first degree*. It is therefore unnecessary that the statute provide a general definition of the word "murder." It is sufficient that the essential elements of the offense proscribed shall be set out in the statute. That is clearly done in this instance. We rule that the court did not err in failing to dismiss the indictment.

█ The defendant has briefed a number of points relating to the manner in which the jury was selected, the qualifications of jurors, and allegedly prejudicial statements the circuit attorney was permitted to make on voir dire examination. There is no merit in the claim that the court erred in not striking juror Barnes from the list because he was 67 years old. This juror was asked if he desired to be excused and he answered that he did not. Section 494.010, which deals with the qualifications of jurors, provides that every juror shall be over twenty-one years of age. Section 494.031 provides that "[t]he following persons shall, upon their timely application to the court, be excused from service as a juror, either grand or petit: (1) Any person over the age of sixty-five years; * * *." Section 494.010 provides the age qualifica-

tions and § 494.031 deals with persons who may be excused from jury service if they desire. It is obvious that the fact that a juror is over the age of sixty-five is not a disqualification and he may serve as a juror if otherwise qualified.

█ It was developed on voir dire examination that during one of the court recesses one of the jurors read an article in a newspaper concerning the progress of the trial. Error is claimed because the court did not strike the proposed juror from the panel. The article was not offered in evidence and is not before us. The juror stated that he realized the article was not evidence and its contents would have no effect upon him—that he would consider only what he heard in the courtroom. No objection or challenge was made to the prospective juror and therefore the matter is not properly before us for review. However, it is obvious that the venireman was not prejudiced or otherwise disqualified by reason of having read the article and we accordingly rule that the court did not err in failing to stike him from the panel of its own motion.

█ During the voir dire examination of the prospective jurors the circuit attorney stated that defendant had been jointly charged with Willie Reed but that a severance had been granted and only defendant was on trial. Although he made no objection at the time, defendant now contends that said statement constituted prejudicial error. We do not agree. In view of the conspiracy proved during the trial the formal statement concerning the joint charge could not have prejudiced the defendant. State v. Deppe, Mo.Sup., 286 S.W.2d 776 [7]. The cases of State v. Castino, Mo.Sup., 264 S.W.2d 372, and State v. Chernick, Mo.Sup., 278 S.W.2d 741, cited by defendant, are factually so unlike the case at bar that they have no application here.

█ Defendant also says that the court erred in admitting evidence concerning actions of Willie Reed and in admitting in

evidence objects taken from him at the time of his arrest. In that connection it should be noted that there was evidence of a conspiracy between defendant and Reed to beat and rob Mr. Schlader; that Reed aided defendant in the commission of the homicide, in efforts to dispose of the body, and was arrested while he and defendant were on a trip in the automobile that had been owned by deceased. In that situation the matters complained of were admissible and no error in that regard appears. This court has said that it "may always be shown that any one of co-conspirators was in possession of the 'fruits of the crime,' or the weapon or instrument with which the crime was committed. State v. Richetti, 342 Mo. 1015, 119 S.W.2d 330, at page 340; State v. Costello, Mo.Sup., 252 S.W. 727; Vol. 2, Wharton's Criminal Evidence, 12th Ed., supra; Underhill's Criminal Evidence, 4th Ed., § 779, pp. 1418-1421." State v. Tripp, Mo.Sup., 303 S.W.2d 627, 632. The cases cited by defendant are not applicable because they deal primarily with statements made by an alleged co-conspirator where no conspiracy had been proved, or the conspiracy had terminated before the statement was made. We have no question here concerning statements made by defendant's associates.

██ It is also defendant's contention that prejudicial error occurred when the circuit attorney was permitted to over-emphasize the question of the death penalty on voir dire examination of the jurors. He does not point out in what manner that question was over-emphasized. We have examined the transcript and find that each juror was asked by the circuit attorney whether he had any conscientious scruples against considering the death penalty as well as life imprisonment in the event defendant was found guilty of murder in the first degree. By reason of the provisions of § 546.130, it is proper to examine prospective jurors in a capital case concerning any conscientious scruples they may have against inflicting the death penalty. State v. Swinburne, Mo.Sup., 324 S.W.2d 746.

We can see no objection to the manner in which the veniremen were examined in this instance. We therefore rule this point against defendant.

██ Defendant has briefed the point that the trial court erred in overruling his motion to suppress evidence obtained by an illegal search of the premises at 3852 Windsor Place and in admitting items thus obtained into evidence. The motion to suppress was heard and overruled by the presiding judge prior to the trial, but the evidence, if any, offered at that time is not contained in the transcript so we cannot review that ruling. However, the trial judge permitted defendant to reassert the motion during the trial (without regard to the time element) and heard evidence thereon. The motion was again overruled. The only items mentioned in the motion which were admitted in evidence were the wardrobe trunk and a five-gallon oil can.

Defendant's mother, Minnie Anderson, testified that she rented the apartment in question; that she paid the rent and was "the boss there"; that defendant had been living there for at least a week before March 19; that police came at 3 a. m. on March 20 and she admitted them; that by 6:30 a. m., all the police and firemen had gone, and at 10 a. m., she locked all the doors and left; that at 2:45 p. m., she returned and found the doors open and her trunk missing from the basement and her oil can, gloves, and iron were missing from the apartment; that she and the landlord both stored property in the basement.

The evidence of witnesses for the State indicated that officers went to the apartment at 3:20 a. m. and, after being admitted by defendant's mother, found the body in the furnace; that thereafter firemen came and dismantled the furnace, and employees of a funeral home removed the body; that at 8:30 a. m., Officer Armstrong returned to the apartment and entered through an unlocked rear door; that he obtained the trunk from the basement and the oil can from behind the heating stove in the living

room and took them to the police laboratory.

In connection with our consideration of this point we note that there is a conflict in the evidence as to whether defendant resided at 3852 Windsor. The mother's testimony indicates that he had resided there for a week. However, defendant's statement reads as follows: "Q What is your name? A Ruben Anderson. Q Where do you live, Ruben? A 4800 on Delmar. Q You live with a girl there? A Yes. Q What is her name? A Dorothy. Q Is 4800 Delmar a house or a hotel? A House. Q Now, Ruben, your mother lives at 3852 Windsor Place, is that right? A Yes."

▬▬▬ We have concluded that the trial court did not err in overruling the motion to suppress. In the first place, the evidence would warrant a finding that defendant did not reside at 3852 Windsor Place. Furthermore, it has long been the rule in this state that "[t]he constitutional guaranty against unreasonable search and seizure is a personal one and affords no protection from search to a person who is not the owner of or in possession of the premises. State v. Askew, 331 Mo. 684, 56 S.W.2d 52, 54 [5]; State v. Green, Mo., 292 S.W.2d 283, 286 [1]." State v. Cantrell, Mo.Sup., 310 S.W.2d 866, 870. To like effect, see State v. Martin, Mo.Sup., 347 S.W. 2d 680 [2], State v. Egan, Mo.App., 272 S.W.2d 719 [6], State v. Rodgers, 364 Mo. 247, 260 S.W.2d 736 [5], and State ex rel. McDonald v. Frankenhoff, 344 Mo. 188, 125 S.W.2d 816 [5]. More specifically applicable to the instant case is the statement that the "search of premises of a parent does not give his or her son or daughter any standing to complain, even though the search was illegal." 79 C.J.S. Searches and Seizures § 58 (1952). We held in State v. Cockrum, Mo.Sup., 278 S.W. 700, that a son had no standing to complain of a search of his father's farm which resulted in the seizure of certain illegal whiskey and in-

strumentalities for making such which were owned by the son.

We have considered the case of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233, which held, under the circumstances there present, that a guest had standing to object to an illegal search. That case, however, is readily distinguishable from the case at bar because there was evidence to indicate that the narcotics seized were under the control of the defendant who was present in the apartment at the time of the search. Since that defendant was charged with possession of narcotics it was said that he need not allege possession or ownership thereof (admissions which would support a conviction) in order to have standing to object to the search. The items involved in the instant case were not items which would have been unlawful to own or possess, and, as heretofore indicated, defendant had not been at the apartment since the preceding day.

We have the further view that, in any event, the admission of the trunk and oil can in evidence was not prejudicial to defendant. This for the reason that defendant, in his statements, referred to these items and told of the manner in which they were involved in his effort to dispose of the body of deceased. We do not think that the physical presence of these objects in court would have increased the adverse effect, if any, of the evidence included in defendant's statements concerning his use of those items. The facts supporting our conclusion in this regard clearly distinguish the instant case from Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed. 2d 171. As heretofore indicated, we rule this contention adversely to defendant.

Our ruling on the preceding point will also dispose of defendant's contention that the court erred in permitting the circuit attorney to refer to the trunk and oil can in his opening statement, and the further contention that it was error to admit the testimony of Officer Armstrong in regard

to his obtention of those items because they were obtained by unlawful search.

■ Defendant also contends that the court erred in permitting the portions of his statement which refer to the trunk and oil can to be read to the jury. That point is without merit. The seizure of those items did not lead to the disclosures made by defendant in his statement in regard thereto. It is a fair inference from the testimony that the fact that defendant told police about those items caused Officer Armstrong to go to the apartment on the morning of March 20 and obtain them.

■ Complaint is also made of the fact that portions of defendant's statement were read to the jury which referred to the lighter and keys of deceased which were obtained from defendant by the officers in Illinois. Since defendant filed no motion to suppress those items he could not complain of their admission in evidence, or of reference thereto in the confession, upon the ground that they were obtained by unreasonable or illegal search. State v. Garrison, Mo.Sup., 305 S.W.2d 447 [6].

■ Defendant contends that the court erred in admitting evidence which tended to show that he was guilty of other crimes and in permitting the circuit attorney to refer to those crimes in his argument to the jury. He refers to evidence indicating that he was guilty (1) of robbery in taking personal property from the body of deceased, (2) of stealing the automobile of deceased and the personal property therein, (3) of transporting said automobile interstate, and (4) of engaging in a dice game.

" 'The well established general rule is that proof of the commission of separate and distinct crimes is not admissible, unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. * * * Evidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted.' State v. Shilkett,

356 Mo. 1081, 204 S.W.2d 920, 922–923. Exceptions to this general rule of exclusion are as well established as the rule itself. On this point this court has twice cited approvingly, State v. Buxton, 324 Mo. 78, 22 S.W.2d 635, 636, and State v. Spinks, 344 Mo. 105, 125 S.W.2d 60, 64, the following from People v. Molineux, 168 N.Y. 264, 61 N.E. 286, 294, 62 L.R.A. 193: 'Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial.' The test of whether evidence of other distinct crimes falls within any of these exceptions has been aptly stated as follows: 'The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. * * *' " State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307.

■ We have concluded that the court did not err in permitting testimony concerning the events of which complaint is made. A conspiracy was proved to "take his money, beat him up, just do anything so we can get his money so we can go to California" (quote from defendant's confession). Proof of the removal of the ring, watch, and billfold from the body of deceased was certainly proper as occurrences closely related to the commission of the crime which tended to establish motive and partial consummation of the plan involved in the conspiracy. The same is true regarding the lighter and keys defendant picked up at the scene of the attack. The set of keys with the miniature license tag thereon logically led to the stealing of the car of deceased, parked nearby, and the contents

thereof. The car was used to go to Illinois in an effort to sell the pictures. There was a logical connection between these events and the original homicide. It was all a part of the plan to get money and dispose of the fruits of the crime. The evidence tended to corroborate the confession of defendant and to connect him with the offense of murder with which he was charged.

Without objection, the circuit attorney was permitted to state in his opening statement that defendant lost the money taken from deceased in a crap game and Mr. McKinstray testified, without objection, that defendant related that fact in his oral confession. In that situation defendant is in no position to complain on appeal of the admission of that evidence. However, we note that such evidence does have some relevancy as it accounts for the fact that defendant did not have the $82, which he said he had taken from deceased, at the time of his arrest twelve hours later.

State's Exhibit 8 was a record of City Hospital No. 1 concerning the examination of an unknown body (later identified as the body of Mr. Schlader) which was found to be lifeless. Defendant says the court erred in admitting the exhibit because it had not been properly identified. We do not agree. The custodian of the record testified that it was a record from the hospital medical records library which was kept in the usual and ordinary course of the business of the hospital. We rule that the record was properly admitted in evidence under the provisions of § 490.680 of the Uniform Business Records as Evidence Law.

State's Exhibit 9(b) is a photostatic copy of an application for a title to the Plymouth car in question upon which appeared the signature of Mr. Schlader. Defendant contends that the court erred in admitting that exhibit because it was not the best evidence and there was no explanation for not producing the original. The contention is without merit. A witness from the Motor Vehicle Division of the Department of Revenue testified that the usual method of keeping the records of that department is to microfilm instruments when they are received and the original is then destroyed; that when a copy is desired it is made from the microfilm. It therefore appears that the original of this exhibit had been destroyed and it was proper to admit the copy made from the microfilm.

Illinois State Trooper Edward Allen testified concerning the arrest of defendant and his associates and to various matters relating thereto. Near the end of the cross-examination the witness was asked to identify defendant in the courtroom and he pointed to the bailiff. Defendant now contends that the court erred in failing, of its own motion, to order all of the testimony of this witness stricken from the record and in failing to instruct the jury to disregard it. This point is obviously without merit. The failure of the witness to identify defendant would be considered by the jury in determining the weight to be given this testimony, but that fact would not require the court to strike the evidence.

There is also no merit in the contention that the court erred in admitting in evidence the set of car keys with miniature license tag attached because said exhibit was immaterial to the issues. The exhibit was admissible because it was properly obtained from the deceased at the time of the homicide (and later found in the possession of defendant) which tended to identify the deceased and to connect defendant with the homicide.

The next contention is that the court erred in admitting in evidence the confession of defendant because such was obtained by duress and coercion and hence was not voluntary. As heretofore indicated, there was an oral confession which was obtained in Illinois, and a written confession taken some hours later after defendant had been taken to St. Louis. Prior to the admission of testimony relating to the oral confession,

a hearing was held outside the presence of the jury in which testimony was taken which related to the voluntary nature thereof. No hearing was held in regard to the written confession and defendant did not testify concerning it. Any evidence on the question as to whether the written confession was voluntary or involuntary was heard in the ordinary course of the trial.

Defendant and his companions were arrested about 10:30 p. m. on March 19. In regard to the oral confession, the evidence presented at the preliminary hearing was to the effect that McKinstray, the FBI agent, questioned defendant from 1:30 a. m. until 2:15, and again from 3:15 to 4 a. m., during which latter period defendant admitted that he participated in the killing of deceased, as heretofore related. McKinstray testified that there were two or three other officers present during a part of the time but that no one threatened the defendant or made any promises to him; that he was advised of his constitutional rights; that they offered to procure food for the defendant but he declined the offer; that the offer of food was not conditioned upon any action on the part of the defendant.

The defendant testified that he was not advised of his constitutional rights, nor offered food or a place to sleep, although he was given a drink of water; that McKinstray "told me I might as well go ahead and sign a confession because he would kick me in my behind, because he hadn't had any sleep; * * * that if I didn't sign a confession over there, I know what the treatment was over here when I come over here, so it was better to sign over there"; that because of these statements he was afraid for his own safety; that it was late at night and the doors were closed; that no one struck him but he was pushed by one of the troopers.

The court, at the conclusion of the hearing on that issue, ruled that the verbal statements were voluntary and admissible.

As heretofore stated, defendant was taken to St. Louis at 7 a. m. and was questioned by Mr. Koster from 10 until 10:45 a. m., at which time a stenographer was called in and the written statement was taken in question and answer form. Mr. Koster testified that so far as he knew defendant had had no sleep but that he was furnished lunch before the written statement was taken; that he completed taking the written statement about noon and it was then typed by the stenographer and defendant was brought back to the office and read and signed it about 3 p. m.

Before the written statement was actually admitted defendant objected to its admissibility on the ground that it had been shown to be involuntary and that his constitutional rights had been infringed upon. The objection was overruled by the court and the exhibit admitted.

To the extent that there was conflicting evidence upon the issue presented, it is evident that the trial court found the State's evidence more credible and found the facts in accordance therewith. We have said that, in determining the issue of voluntariness, "unless manifest error has been committed appellate courts will defer to the trial court's ruling in view of its better opportunity to arrive at the truth." State v. Gibilterra, 342 Mo. 577, 116 S.W. 2d 88, 94. We defer to the trial court on the matter of credibility.

In the situation presented we will consider the confessions in the light of the testimony given by the officers and certain undisputed evidence. We are mindful of the rule that a "confession obtained by mental coercion or mental punishment is incompetent as evidence. * * * It is also true that the age, experience and intelligence of the accused must be considered, along with all the other circumstances." State v. Barnett, Mo.Sup., 338 S.W.2d 853, 856. Defendant was apparently 21 years of age, but there is nothing in the evidence concerning his education, mental ability, or experience.

The oral confession was obtained after defendant had been in custody about 5½ hours and had been questioned not more than 1½ hours. During that time he had been offered food but refused it. He had not slept. At the time the written confession was taken he had been in custody for 12 hours and we assume that he had had no sleep. The intermittent questioning had totaled between two and three hours. He was fed before he gave that statement. We have concluded that these facts do not warrant a conclusion, as a matter of law, that the confessions were involuntary and that defendant was therefore denied his constitutional rights. We rule that the court did not err in admitting the confessions. State v. Bridges, Mo.Sup., 349 S.W.2d 214 [4]. Defendant has cited the case of Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, but that case is clearly distinguishable upon the facts. In Spano the defendant was questioned continuously for eight hours, notwithstanding the fact that he had repeatedly requested the opportunity to consult with his attorney, which requests were denied. Defendant had already been indicted and therefore the officers were not seeking to solve a crime but were merely trying to obtain a statement which would lead to his conviction. Spano is not applicable here.

It is also suggested by defendant that the confessions should not have been admitted because there had not been prior proof of the corpus delicti. In that connection we have held that it is not essential that independent proof of the corpus delicti come first in the order of proof. State v. Deyo, Mo.Sup., 358 S.W.2d 816. There is an abundance of independent proof of the corpus delicti in this case. The point is ruled adversely to defendant.

Defendant has briefed the point that the court committed prejudicial error in its statements and actions toward defendant's counsel and defendant in the presence of the jury. The only incident referred to in his motion for new trial is the following: "Mr. Shepherd: May the record reflect that during the time that the reporter was just out of the room adjusting her stenotype machine, a conference was held between the judge and the counsel for the State within the hearing of the jury and without hearing of the defense. * * * The Court: Are you implying there was any misconduct on the part of Mr. Fredericks [assistant circuit attorney] on what he said or did with me up here? Mr. Shepherd: Yes, sir, I do. The portion that I heard. The Court: Tell me what it was. Mr. Shepherd: The portion I heard was that I be reprimanded. It was loud enough for me to hear * * *. The Court: I will indicate this to you, Mr. Shepherd. I don't know what you want me to do. What am I supposed to do? Mr. Shepherd: My statement was, that an event occurred, nothing more, or nothing less. * * * The Court: I'm going to be as cautious as I can, but I will make this indication to you, Mr. Shepherd. I, as a Court, am not on trial here now, and I'm not going to be put on trial by you during this proceeding. I made no reprimand of you. I made no statement whatsoever one way or another, and but for the fact that you have brought this matter up before the jury, and in the presence of this audience, there would have been nothing on earth ever occurred of it. * * * I don't reprimand you, and I told you gentlemen to go on and proceed. I indicate to you now, if you have nothing further, sir, just be seated, because our rules require counsel to either sit or stand at counsel table during the course of the trial. Let's go ahead, gentlemen."

We find nothing in the foregoing which would reasonably be considered prejudicial to defendant. The defendant's attorney chose to make a statement in the presence of the jury, the reasonable implications of which were naturally disturbing to the court. It is our view that the remarks of the judge concerning the matters were not improper. Defendant's counsel requested no specific relief in regard to the alleged

conversation and made no objection to any statement made by the court. No error appearing, this assignment is disallowed.

■ When the body of decedent was removed from the furnace John Bendick, an employee of a funeral home, collected a number of burned or partially burned articles from the furnace. These items were placed in a bag and when Mr. Bendick testified the contents of the bag were dumped on a paper on a table. He specifically identified (1) a piece of shirt, (2) part of a paper pad, (3) a hat, and (4) a pair of glasses. He identified the remainder of the contents generally as having been taken from the furnace. The said remaining items were admitted as one exhibit. Defendant's contention in regard to the foregoing is that "the court committed prejudicial error by allowing the prosecuting attorney for the State, over the objection of the defendant, to shake burned and charred articles from a bag onto a table in the presence of a jury, when some of the burned and charred articles were unidentifiable and never admitted into evidence or offered by the State and other of the articles being State's Exhibits 17, 18, 19, 20 and 24." In his argument defendant also asserts that the placing of the items on the table caused the jury to become biased and prejudiced against him.

When the circuit attorney sought and received the permission of the court to dump the contents of the bag on the table the defendant did not object. Some time later, after the witness had given considerable testimony, defendant moved for a mistrial on the ground that the display of the articles had inflamed the jury and prejudiced defendant's rights. We think any objection defendant desired to make should have been made more promptly. Moreover, all of the contents of the bag were identified generally and admitted in evidence. It was proper to admit items taken from the furnace in order to lay a foundation for later witnesses to identify the items as belonging to deceased. Such

testimony would tend to identify the victim of the homicide. This court has held that articles found upon a body are admissible as evidence tending to establish the identity of the body. State v. Dickson, 78 Mo. 438 [6]. For the reasons stated, this point is overruled.

■ There is no merit in defendant's contention that the court erred in refusing to strike the testimony of witnesses Brocksmith and McKnight concerning a blood sample which he says was not properly identified. The identity and chain of custody of that sample was proved with meticulous care. Brocksmith testified that he watched Dr. Benjamin extract the blood from the skull of the body taken from the furnace. It was placed in a bottle and handed to the witness who stated that he delivered it to Miss McKnight. Miss McKnight testified that she typed the blood and then delivered the specimen to William Secunda. Mr. Secunda testified that he received the blood from Miss McKnight and proceeded to test it for carbon monoxide content.

■ The defendant's next contention is that the court erred in overruling his motion for a directed verdict at the close of all the evidence because, "on the indictment charged and on the instructions given to the jury, there is no evidence of murder in the first degree and that apart from the defendant's confession, no evidence of any crime." We will not extend this already lengthy opinion by a detailed discussion of this point. We think it apparent from our statement of facts and the contentions heretofore discussed that the State made a submissible case of murder in the first degree against defendant.

■ Defendant complains of the refusal of the court to give Instruction No. 6 offered by him which provided that in the event the jury found defendant guilty the punishment should not exceed a fine of $100 or imprisonment not exceeding two months, or both. His theory in offering that in-

struction seems to have been that since § 559.010 does not define the word "murder," the indictment does not allege an offense thereunder and hence the only punishment that could be assessed in this case is for a common law offense and that § 556.-110 limits the punishment for such an offense to that set out in the requested instruction. Our ruling heretofore on defendant's contention that his motion to dismiss the indictment should have been sustained substantially disposes of the present contention. We accordingly rule that the court did not err in refusing the instruction.

Defendant's next contention is that the court erred in refusing to give his offered instruction submitting murder in the second degree. The State's main instruction submitted the offense of murder in the first degree in usual form. It is conceded by defendant that if the submission had been on the theory of "felony murder" a second degree submission would not have been required. But in the manner submitted he argues that the instruction on the lesser offense should have been given because (1) there was no evidence of the essential element of deliberation, and (2) there was no evidence of a conspiracy to *kill* the deceased and, therefore, since the jury could have believed his oral statement that he was out of the room when the first (and perhaps fatal) blow was struck, he was not responsible for that act on the theory of concerted action.

■■■■■ We have concluded that the court did not err in refusing to give a second degree instruction. Defendant's confession stated that he, White, and Reed planned that when Mr. Schlader came to the apartment they would "beat him up, just do anything so we can get his money." For a period of time before the homicide, defendant and Reed sat in the living room, each holding an iron pipe, awaiting the appearance of their victim. That is strong evidence of deliberation and there is no evidence of an absence of deliberation, i. e.,

no evidence that the blows were struck as a result of some provocation or while defendant was under the influence of a violent passion suddenly aroused. It may be that the conspirators did not specifically plan to kill deceased, but they did plan to beat and rob him. "There is a universally recognized rule of law that, at least in the absence of evidence to the contrary, a sane man is presumed to intend the natural and probable consequences of his intentional acts." State v. Martin, Mo.Sup., 260 S.W. 2d 536, 539. It has been said that the quoted rule is "particularly applicable where the conduct is unlawful and dangerous to the safety and lives of others. General criminal intent exists when from the circumstances the prohibited result may reasonably be expected to follow from the offender's voluntary act, irrespective of any subjective desire to have accomplished such result. One cannot excuse the probable consequences of his own voluntary act by claiming that he had a mental reservation and performed the act or acts voluntarily done without an intent." 22 C.J.S. Criminal Law § 35 (1961). The death of decedent was a natural result of the execution of a conspiracy to beat him with iron pipes to the extent necessary to accomplish a robbery. Moreover, in defendant's oral confession he stated that they "made preparations for this robbery by collecting some pieces of pipe and a flat iron, and some kerosene." (Apparently they did not actually purchase the kerosene as defendant's mother testified that she bought it and used some of it every morning to start the fire in her stove.) The fact that they included kerosene in their collection of items would indicate that the elements of the conspiracy specifically included the possibility that the victim would be killed and that the kerosene would be used (as the evidence indicates it was) in an attempt to dispose of his body.

If we assume, for the purposes of discussion only, that defendant is correct in his contention that he would not be accountable for the acts of his accomplice because the conspiracy was to rob rather

than to kill, that fact would not have required an instruction on murder in the second degree. If we assume that such a theory is legally and factually sound, defendant would not have been guilty of murder in either the first or second degree but would have been entitled to an acquittal.

Upon the record before us we have concluded that defendant was either guilty of murder in the first degree or he was not guilty at all. In support of his contention defendant cited State v. Warren, 326 Mo. 843, 33 S.W.2d 125, and State v. Majors, 329 Mo. 148, 44 S.W.2d 163, but those cases involve factual situations so unlike the one before us that they have no application. We have not found a case precisely like the case at bar but the following cases tend to support our conclusion: State v. Hester, Mo.Sup., 331 S.W.2d 535, State v. Barbata, 336 Mo. 362, 80 S.W.2d 865 [2] (and cases discussed therein), State v. Wooley, 215 Mo. 620, 115 S.W. 417 [10], State v. Sneed, 91 Mo. 552, 4 S.W. 411, and State v. Talbert, 351 Mo. 791, 174 S.W.2d 144 [2].

The next contention relates to matters contained in the main verdict-directing instruction. The entire argument in regard thereto is as follows: "The court committed prejudicial error in giving and reading to the jury an instruction defining the words 'feloniously,' 'deliberately,' and 'malice' and by also giving an instruction to the jury allowing the jury to find the defendant guilty of murder in the first degree if the jury found that the defendant acted with another or others in the commission of the crime. There is no evidence that the defendant in this case acted with others, the only evidence being that he acted with a Willie Reed. The defendant contends that the words set forth herein were improperly defined and should not have been given to the jury and, therefore, this was a prejudicial error." No cases are cited.

██ "Deliberately" is defined in the instruction as "done in a cool state of blood. It does not mean brooded over or reflected

upon for a week, a day, or an hour, but it means an intent to kill executed by the defendant in a cool state of the blood, in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose and while not under the influence of a violent passion suddenly aroused by some provocation." A similar definition was approved in State v. Barbata, 336 Mo. 362, 80 S.W.2d 865. The other words complained of were defined in the instruction as follows: " 'Feloniously,' as used in these instructions, means wickedly and against the admonition of the law." " 'Malice,' as used in these instructions, and in its legal sense, does not mean mere spite, ill will, hatred, or dislike, as it is ordinarily understood, but it means that condition of the mind which prompts a person to intentionally take the life of another without just cause, justification or excuse, and signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief." Those are conventional definitions that have been often used in our criminal instructions. They are not erroneous. The instruction was not erroneous because it permitted a finding that defendant, "either acting alone or jointly with another or others," did the acts charged. The disjunctive "or" was used so that the jury could find that defendant acted alone or with one other person or with more than one other. There was evidence that three persons conspired together but that only two were present at the time of the homicide (according to defendant's written statement he, alone, struck the fatal blows). We find no error in the instruction in any of the respects complained of under this point.

██ Another contention of error in regard to the main instruction is that it erroneously included the words "with a certain iron pipe or piece of iron pipe." It is said that the indictment alleged the use of "a certain iron pipe," but that the instruction permitted the jury to surmise and guess and to find defendant guilty upon a finding that any piece of pipe was used.

This point is obviously without merit. The only reasonable meaning to attribute to the submission complained of is that it required a finding that the homicide was committed by beating Mr. Schlader with an iron pipe. No piece of pipe was admitted in evidence.

■ The next contention in regard to the main instruction is that it was erroneous because it failed to require a finding that "defendant did strike a mortal wound upon Anthony J. Schlader." We are not sure we understand this contention but we assume defendant is referring to the fact that the indictment alleged that he "did strike, beat and wound at and upon the body of the said Anthony J. Schlader, with the aforesaid iron pipe, thereby feloniously inflicting a mortal wound * * * from which said mortal wound Anthony J. Schlader did die," while the instruction required a finding that he "did strike, beat and wound at and upon the body of said Anthony J. Schlader with the aforesaid iron pipe or piece of iron pipe and did thereby and in such manner wilfully, deliberately, premeditatedly, on purpose, and of his malice aforethought kill said Anthony J. Schlader * * * and that on said 19th day of March 1962 said Anthony J. Schlader died as a result of such striking, beating and wounding * *." We do not think it is material that the instruction did not use the words "mortal wound." It required the essential finding that Schlader was beaten and wounded and died as a result thereof. The instruction was not erroneous in that respect.

■ Defendant also complains that Instruction No. 2 is erroneous because it authorized a finding of guilty if the jury found that defendant offered encouragement to others. No cases are cited. The instruction reads as follows: "The court instructs the jury that all persons are equally guilty who act together with a common purpose and common intent in the commission of a crime and a crime committed by two or more persons acting jointly and with a common purpose is the act of all and of each person so acting. If a person be present at or near the scene of the commission of a crime and by words or acts or by his presence aids, abets, assists, advises, or encourages the crime with the intent that his presence or his acts should encourage assist and abet the crime committed, then that person is equally guilty with the person or persons who actually committed the physical deed."

The evidence supported the giving of that instruction and defendant does not point to any defect in the form thereof. The words "encourage" and "encourages" as used therein do not constitute error.

Another point briefed by the defendant is that the court erred in allowing counsel for the State to include in his final argument the following statements: (1) *"Let the State of Missouri be known, and let the United States be known, and let the world be known that this kind of an act cannot be tolerated, whether it be in gas chambers of Germany, or right here in the City of St. Louis in a furnace burning with oil,* that kind of act cannot be tolerated. We are not trying to punish this man. We are not trying to reap revenge upon him. We are trying to tell all of those who have inclinations along that line, don't you do it, because we'll take from you the most that we can." (2) "He speaks of him being a Negro boy, and he says to you, you and I wouldn't want to be in this position. There is nothing wrong with being a Negro in 1962. They get no more harsh treatment in 1962, and they get no license to do this either. That is not an issue. *I don't care if he is black, white, or polka dot, when he commits this act, and he is a human being living in our society, he must suffer the consequences of the society, and the laws created by it."* (The portions italicized are the words specifically complained of.)

There was no objection nor motion for a mistrial in regard to either of those statements. Defendant contends that we should grant a new trial because the statements were so prejudicial that the error could

not have been corrected by an objection or by instructions to the jury to disregard same. He also indicates that the trial court should have declared a mistrial of its own motion. In that connection we have said that "a trial court does have the right, and the duty, to intervene in a criminal case without objection being made, when it appears that such grievous error is being committed as to prevent a fair trial. State v. Rhoden, Mo., 243 S.W.2d 75; but it is not always imperative that the court declare a mistrial when and if it sees fit to intervene * * *." State v. Laster, 365 Mo. 1076, 293 S.W.2d 300, 305.

Defendant has cited the case of State v. Groves, Mo.Sup., 295 S.W.2d 169, but that case is not applicable here. The principal argument in Groves which was held to require a reversal dealt with the extreme statements of the prosecuting attorney as to his personal belief in the guilt of the defendant, and objections were made thereto which were overruled.

We think the argument italicized in (1) supra, was improper. The reference to the gas chambers in Germany was not supported by the evidence and no part of the statement was really material to the main issue in the case. The circuit attorney had a right to vigorously urge the jury to inflict the extreme penalty but the analogy in question was improper. However, in view of the nature of the crime, we do not consider that the statement would arouse or inflame the jury unduly so as to constitute prejudicial error. The matter was called to the attention of the trial court (for the first time) in the motion for new trial and its ruling thereon indicates the view of the court that the argument did not require the granting of a new trial. The trial judge was in a better position to determine the effect of the argument than we are, and we are inclined to defer to his judgment in that regard. We do have the independent view, however, that the evidence concerning defendant's effort to burn the body in the furnace was before the jury and was re-ferred to in the argument of both attorneys and hence one more reference to it, in the manner heretofore quoted, would not be prejudicial error.

We do not think the italicized statement in (2), supra, was improper under the circumstances. Defendant's counsel, in a plea for sympathy or leniency, referred to the fact that defendant was a Negro. The statement under consideration was in answer to that argument. It is obvious that the circuit attorney was simply telling the jury that the fact that defendant was a Negro should not be considered in determining the issues submitted to it. We rule that defendant is not entitled to a new trial because of statements (1) and (2) which were made in the closing argument of the circuit attorney.

The defendant's final contention is that "the court committed prejudicial error in refusing to grant the defendant a new trial as a result of the punishment assessed against this defendant for the reasons that the punishment was cruel and unusual and the apparent result of inflammatory arguments and remarks of the prosecuting attorney and based on prejudicial and incompetent evidence which was solely attributable to Willie Reed, a co-defendant of defendant Anderson."

We have heretofore ruled that no incompetent evidence was admitted and that the argument of the circuit attorney did not constitute reversible error. Section 559.030 provides, in part, that "persons convicted of murder in the first degree shall suffer death, or be punished by imprisonment in the penitentiary during their natural lives." It is primarily the function of the jury to assess the punishment, subject to the discretionary power of the trial court to reduce the same. State v. McHarness, Mo.Sup., 255 S.W.2d 826 [4]. In this case the jury fixed the punishment within the limits of the statute. This court has repeatedly held that "the fixing of the punishment for crime is a legislative and not

a judicial function, and when, as in this case, the punishment is assessed within the limits prescribed by statute, it cannot be adjudged to be excessive." State v. Copeland, 335 Mo. 140, 71 S.W.2d 746, 752. See also State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335, and State v. Laster, supra, 293 S.W.2d 300. For the reasons stated, this point is ruled adversely to defendant.

An examination of the record as required by S.C. Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All concur.