STATE of Missouri, Plaintiff-Respondent,

v.

Robert Fay ADAMS, Defendant-Appellant.

No. 56772.

Supreme Court of Missouri,
Division No. 2.

July 16, 1973.

John C. Danforth, Atty. Gen., Neil Mac-Farlane, Asst. Atty. Gen., Jefferson City, Attorneys for respondent.

Walker & Salveter, Springfield, Wayne T. Walker, Springfield, Attorneys for appellant.

DONNELLY, Judge.

Appellant, Robert Fay Adams, was convicted of murder in the second degree by a jury in the Circuit Court of Greene County, Missouri, and his punishment was assessed at imprisonment for a term of forty years. Following rendition of judgment and imposition of sentence, an appeal was perfected to this Court. We affirm.

The appeal having been taken to this Court prior to January 1, 1972, the effective date of new Article V of the Constitution, we have jurisdiction pursuant to then Art. V, § 3 of the Missouri Constitution, V.A.M.S.

Appellant and his wife, Willa Lee Adams, lived with their two daughters, Donna Goodman and Adele Adams, at 2372 East Broadmoor, Springfield, Missouri. There is much evidence of marital difficulties between husband and wife, primarily caused by infidelity on the part of the wife over a period of many years.

On the evening of February 2, 1970, appellant followed his wife to a motel in

downtown Springfield, waited outside for several hours, and then observed his wife come out of the motel with a man, get into her car, and drive away.

Willa Lee Adams died the morning of February 3, 1970, at the home, as a result of a gunshot wound. Appellant, on direct examination at trial, gave the following account of the shooting:

"Q. Now, Bob, after—you heard your daughters testify about what happened on the morning of February 3rd? A. Yes, sir.

"Q. They did get up and go off to school, both of them?

"A. They were both gone.

"Q. They were both gone? A. Yes. sir.

"Q. Tell the jury, beginning from the time—just tell this jury what happened after both girls left that house.

"A. She woke me up, and I wasn't expecting to be woke up at all, she had her own car and there wasn't any reason for me to get up that I knew of, I guess I was supposed to take her to work, this did happen on occasion, her car wasn't a new one, it was a '60 model and the battery would go bad or something like that—

"Q. Now, speak up, Bob, so they can hear you. I want the jury to hear you. You have a tendency to drop your voice.

"A. Her car didn't—for some reason I was to take her to work, I never asked why, and I went on down— she was in the bathroom, and as I went by the bathroom door, why, she was getting ready to leave to go to work and I went on into the bedroom, my clothes were there by the bedroom door, it's a his and hers closet and my side of it is

right next to the door, and I was changing clothes and she came in, she came through the door and it started, I guess.

"Q. She came through the door and what did you say there?

"A. I guess it started, I guess I started it, I asked her if she was going to be late that night. I said that I wanted to talk to her, I asked her in the morning, you know, if we could talk that evening, and she knew what I meant, I tried to talk things out and well—anyway, I asked her—she spun around and said, 'You did follow me, didn't you?', and of course I did, I had to admit it and I told her, yes.

MR. WAMPLER: I can't hear the defendant, Your Honor.

THE WITNESS: I'm sorry.

"Q. (By Mr. Yocom) Speak a little louder so that they can hear you clear in the back of the jury. I want everybody to hear what you say, Bob. A. I told her—I said, 'Yes,' and she called me every name in the book.

"Q. What did she call you, Bob, tell the jury?

"A. Sonofabitch, bastard, and a few words I can't use.

"Q. What did she say, then Bob? A. She said, 'You damn fool, don't you know what you did, you've raised a daughter that isn't even your own.'

"Q. What did she do at that point, Bob?

"A. She was mad, she started to swing —

"Q. Now, at the time she said this, when she said, 'You raised a daughter that isn't even your own,' did she say anything about who the man was, did she name him? A. Yes, sir.

"Q. And then what did she do? A. She started to swing on me.

"Q. What did you do? A. I started to try to catch her arm.

"Q. How did you do that? A. I'm long armed and when she swings on me, why, as long as I catch the indication that she's coming at me, all I do is just tilt forward and catch her on the shoulders and that way she hits me on the arms and she can't get to me.

"Q. You did that? A. I started to and she saw what I was going to do.

"Q. Then what did you do? A. She spun—my gun was in the holster in the closet—

"Q. Where was it? A. Hanging on —let's see, if you was coming through the door—if I was facing the closet it would have been on my left, if I would have been facing the closet door.

"Q. It was at the east end of the closet door there in the bedroom?

"A. Yes, sir, it would have been the east side.

"Q. All right. Go ahead. A. When I got my clothes out to get dressed I uncovered the gun, it was hanging out on a hanger.

"Q. What did she do then, Bob? A. I guess she saw it because she started for the closet.

"Q. What did you do? A. The only thing that I knew that was in there that she could use was that gun and as I started to move toward her her hand was going to it, I keep it on a hanger, it's a regulation holster and belt, it's got hooks on the end of it, and if anybody touches it it will fall.

"Q. What did you do then, when she started for the gun?

"A. I went for her and got her hand.

"Q. How did you go for her? A. I caught her hand.

"Q. Go ahead, what happened then? A. The gun fell onto the floor, you just touch it and it will go all the way to the floor, just drop off the hanger.

"Q. What did she do then? A. Kind of screeched, she was just mad, and she spun and went out of the room.

"Q. What did you do? A. I stood there for a minute, I didn't know what had happened.

"Q. What did you do then in relation to the gun?

"A. Reached over and picked it up.

"Q. Did you see her again, then? A. I had just about—I just touched it as she came through the door.

"Q. Did she have anything in her hand? A. A knife.

"Q. A knife? A. Yes.

"Q. I'll show you Defendant's Exhibits C and B. I've shown you these before, have I not? A. Yes, sir.

"Q. You have seen these before? A. Yes, sir.

"Q. When? A. She had them that morning.

"Q. She had them both or had one of them?

"A. No, I don't know which one, I think it was the small one, because it was bright.

"Q. You think it was Defendant's Exhibit C?

"A. It was bright.

"Q. It was bright like State's (sic) Exhibit C? A. Yes.

"Q. You had seen these in the home there before, hadn't you?

"A. Yes.

"Q. Then what happened? A. I'm scared of knives and I saw that thing and I had my hand on the gun anyway—

"Q. How did you have your hand on the gun?

"A. I reached over to pick it up.

"Q. Did you pick it up by the butt first or by the barrel first?

"A. The barrel was sticking toward me.

"Q. Now, you're left handed and you were holding it in your left hand, right? A. Yes, sir.

"Q. All right. When you saw the knife in her hand what did you do then? A. I swung at that knife.

"Q. With what? A. With the gun.

"Q. Butt first or barrel first? A. I had it by the barrel, I was holding it by the barrel first.

"Q. So you swung at it with the butt? A. Yes, sir.

"Q. All right. Then what happened?

"A. I missed. I swung about three times at least.

"Q. All right. What happened then? A. I got cut.

"Q. Where did you get cut? A. Apparently on my thumb.

"Q. All right. Would you point to your thumb where you got cut on the thumb? A. Right across here (indicating).

"Q. Was there a big scar there? A. There was.

"Q. Is there much of a scar there now? A. It shows.

"Q. Very little, does it? A. Not a great deal.

"Q. Not a great deal, all right. Then what happened? Did you continue to hold the gun? A. I couldn't, I lost it.

"Q. The gun went out of your hand? A. Yes, sir.

"Q. Then what did you do? A. I ran.

"Q. Where did you run? A. Across the bed.

"Q. You got up on the bed with your feet? A. Yes, sir.

"Q. All right. Then what happened? A. I kept trying to get to the door and every time I would come across one side of the bed she was there.

"Q. All right, you were up on the bed at least on two occasions?

"A. I went back and forth across the bed I don't know how many times.

"Q. All right. What is the next thing you remember?

"A. I didn't make the door again, it was over on the closet side, I had to turn and go back over that bed and I didn't make it, I was just right by the side of the bed when I heard that hammer go back.

"Q. Then what happened? A. I don't know.

"Q. Did you hear the gun fire? A. No, sir.

"Q. What is the next thing you remember after you heard the hammer go back? A. She was lying beside me on the floor.

"Q. Where was the gun? A. Above us.

"Q. Was it near her body? A. Yes, sir.

"Q. Did you kill your wife? A. No, sir.

"Q. Did you hurt your wife or intend to hurt your wife?

"A. I've never hurt my wife in my life.

"Q. Why didn't you call the police after you realized she was dead?

"A. I couldn't, I couldn't leave her, I couldn't leave her.

"Q. Why couldn't you leave her? Why couldn't you call the police?

"A. I couldn't tell the girls—

"Q. You couldn't tell them what? A. She tried to kill me."

On February 6, 1970, appellant buried the body under some gravel in Kissee Mills Park in Taney County, Missouri.

On March 14, 1970, the Sheriff's Office in Escambia County, Florida, received word of an attempted suicide at a trailer park seven miles from Pensacola, responded to the call, discovered appellant, unconscious and lying on a bed in a trailer, and removed him by ambulance to the Escambia General Hospital.

On March 20, 1970, officers from Greene County, Missouri, left Pensacola with appellant in their custody, and returned to Springfield.

■ Appellant first asserts the trial court erred in failing to suppress, as violative of the Fourth and Fourteenth Amendments, evidence seized and photographs taken as a result of four searches made without warrants and not incident to arrests. The first search was of the bedroom in Escambia County, Florida where appellant was found unconscious. The next search was of appellant's automobile in Pensacola (with the consent of a woman companion). The next search was of the residence in Springfield on March 20, 1970 (with the consent of the father of Willa Lee Adams). The last search was of the residence in Springfield on March 30, 1970 (with the consent of Donna Goodman).

We need not decide the troublesome issues of (1) application of the *plain view* doctrine (see Annotation, 29 L.Ed.2d 1067), (2) of *standing* (see Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208, 1973; and In Re J. R. M., Mo., 487 S.W.2d 502); and (c) of *consent* (see Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854, 1973; Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; Drummond v. United States, 8 Cir., 350 F. 2d 983; and Gurleski v. United States, 5 Cir., 405 F.2d 253). Appellant testified at trial to substantially the same facts which the evidence in question tended to prove. In this circumstance, even if the trial court erred in admitting such evidence, we are "able to declare a belief that * * * [such error] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed. 2d 705 (1967); Gladden v. Frazier, 388 F. 2d 777 (9th Cir. 1968); State v. Lenahan, 12 Ariz.App. 446, 471 P.2d 748 (1970); Tooley v. State, 1 Tenn.Cr.App. 652, 448 S.W.2d 683 (1969); Cf. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 and Cannito v. Sigler, 449 F.2d 542 (8th Cir. 1971).

■ Appellant next asserts the trial court erred in admitting in evidence two written confessions and one oral confession. The trial court's finding is as follows: "Now, with reference to the statements made by the defendant, again the Court bases its ruling on all the evidence admitted at any time on any motion to suppress in this case and on the basis of that evidence does find and determine beyond a reasonable doubt that the officers did advise the defendant of his Miranda rights, that the defendant understood them, and knowingly, intelligently, and intentionally

waived them, and that the statements in question were voluntarily made by the defendant, and none of them were procured by coercion, threats, or through fear, or induced by any promise of leniency or otherwise. The motion as to those items, therefore, is overruled. The Court does find and determine that each such statement is competent evidence."

The trial court's finding is supported by substantial evidence. We do not believe the confessions were involuntary and inadmissible as a matter of law.

■ Appellant next asserts the trial court erred in not sustaining his "motion to quash the jury panel because of the irregularity of the bailiff in excusing many of the members of the panel in contravention" of § 495.090, RSMo 1969, V.A.M.S. In State v. Ward, 74 Mo. 253, 256 (1881), it was recognized that "this court has repeatedly held statutes in respect to the empaneling of juries in criminal cases directory, and that it will refuse in any event to interfere unless some prejudice to the defendant from a lack of compliance with statutory provisions be inferable from the circumstances."

The *Ward* position was recently reaffirmed in State v. Thompson, 472 S.W.2d 351, 353, 354 (Mo.1971): "These sections have uniformly been construed as merely directory and not mandatory, and appellant has failed to show that he has been prejudiced or that his interests have been adversely affected by failure to strictly observe these statutory provisions for summoning jurors. This is the test." We believe no prejudice is inferable from the circumstances in this case.

■ Appellant next asserts the trial court erred in discharging for cause two panel members of the jury for the reason they were opposed to capital punishment. He cites Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 1776 (1968), in support of his assertion. The *Wither-*

*spoon* holding does not govern this case because the jury did not impose the death penalty. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

■ Appellant next asserts the trial court erred in permitting cross-examination of appellant as to whether he had previously stated he intended to kill his wife and in permitting rebuttal testimony to such effect.

On direct examination, appellant testified that he did not kill his wife. On cross-examination, the following occurred:

"Q. Within the last twelve months, Mr. Adams, have you ever mentioned to anyone that some day you would kill your wife and make it look like a suicide?

MR. YOCOM: If the Court please —

THE WITNESS: No, sir."

In rebuttal, witness Dorothy Newton testified:

"Q. (By Mr. Wampler) Mrs. Newton, at the time and place that you just testified to did you have a conversation with the defendant regarding his wife Willa Lee Adams? A. Yes.

"Q. And what did the defendant say to you?

"A. Well, he mentioned that he would —he had thought about killing her by some method that would make it look like suicide so that, you know, it wouldn't be known that he had done it.

"Q. What was the last part of your answer?

"A. So that it wouldn't be known that he had done it.

**154**

"Q. Did you discuss this further with the defendant in any way?

"A. Oh, yes.

"Q. What else did he say? A. Well, he told me that such a means might be carbon monoxide by making it —by giving her a sleeping tablet or something in her coffee so that when she would be asleep, and then perhaps causing the car to—or putting her in the car and then causing the car to give off carbon monoxide."

We are of the opinion that the trial court did not err. In view of appellant's denial of guilt, the cross-examination and the rebuttal testimony were proper. State v. Scown, 312 S.W.2d 782, 786, 787 (Mo. 1958); State v. Kaufman, 254 S.W.2d 640, 641, 642 (Mo.1953).

■ Appellant next asserts the trial court "erred in giving Instruction No. 6 which submitted first degree murder since there was no evidence to prove deliberation, premeditation and malice aforethought." The assertion is without merit. "Since appellant was convicted of murder in the second degree, he has no complaint against the instruction on first degree murder." State v. Aubuchon, 394 S.W.2d 327, 334 (Mo.1965).

Appellant next asserts the trial court "erred in giving Instruction No. 7 which submitted second degree murder since there was no evidence to prove premeditation and malice aforethought." We have reviewed the record and consider the evidence sufficient to sustain the conviction. State v. Henke, 313 Mo. 615, 285 S.W. 392 (1926).

■ Appellant finally asserts the trial court "erred in giving Instruction No. 9 since same is ambiguous and assumes as a fact that the defendant shot Willa Lee Adams." Appellant cannot complain of an instruction given "at his instance." Rule 26.-06, V.A.M.R.

The judgment is affirmed.

HENLEY, P. J., and MORGAN, J., concur.

FINCH, J., not a member of Division when cause was submitted.