STATE of Missouri, Plaintiff-Respondent,

v.

Elmo Cecil WOOLFORD,
Defendant-Appellant.

No. KCD28313.

Missouri Court of Appeals,
Kansas City District.

Nov. 29, 1976.

Motion for Rehearing and/or Transfer
Denied Dec. 23, 1976.

Application to Transfer Denied
Feb. 14, 1977.

James R. Bickel, Nevada, for defendant-appellant.

John C. Danforth, Atty. Gen., Robert Presson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

DIXON, Presiding Judge.

Defendant was charged by information with first degree murder. A jury found defendant guilty of murder in the second degree and fixed his punishment at 10 years. The sufficiency of the evidence is at issue, so a detailed recitation of facts will be necessary.

The State's evidence was as follows. Around 7 p. m., on August 26, 1974, witness Patty Dobbs drove by the farm of the victim, Dick Graham, located on Hainline Road. When the witness returned back along Hainline Road from the opposite direction a short time later, she observed a green Oldsmobile blocking the road where it intersects with Highway 82. The portion of Hainline Road on which Dick Graham's house is located is intersected by only one road which is across from Dick Graham's house. The witness did not notice anything unusual when she passed by the victim's house the first time, but when she drove back by at around 7:15 to 7:20 p. m., she saw Dick Graham lying on the ground not far from the road and notified the police.

Patrolman Moore testified that at approximately 7:45 p. m., on August 26, he was proceeding to a reported one-car accident at the intersection of Hainline Road and Highway 82. On the way, he was stopped by Patty Dobbs and proceeded to the home of Dick Graham where he found the victim lying on the ground approximately five steps from the road. Graham had blood running down his face and on his chest, and there was no movement or breathing.

The chief of police, Ernie Clawson, testified that at approximately 7:35 p. m., on August 26, George Smith came to his home, and they had a conversation concerning defendant. Following this conversation, Chief Clawson started out in search of defendant when he was notified by his dispatcher of the discovery of Dick Graham's body. He proceeded to the victim's home, arriving there around 10–15 minutes after talking to George Smith. He then proceeded to the scene of the one-car accident where he observed a dark green Oldsmobile blocking Hainline Road where it intersects with Highway 82. He further testified that there are no roads which intersect Hainline Road between the point of the accident and the victim's residence.

Trooper Harper of the Missouri Highway Patrol testified that the dark green Oldsmobile blocking Hainline Road was registered to defendant's wife.

George Smith testified that he lives approximately one block from defendant. During the summer prior to trial, he was sitting in front of his house when he observed a dark colored Oldsmobile driven by defendant leave defendant's house, spinning its wheels. There were two passengers in the car. Defendant returned alone about three minutes later, went into his house and immediately came back out with a rifle or a shotgun. Defendant placed the gun in his car and left in a manner which was "rough" or "rougher than he was the first time." When defendant left the second time, wit-

ness Smith went to the home of Chief Clawson to report the incident because he knew defendant "and in past experience with him I figured that somebody was going to get hurt."

Witness Durf Freeny testified that between 7:30 and 8:00 p. m. on August 26 she observed a dark green Oldsmobile with a driver and two passengers driving rather fast and pull into an alley where a girl either jumped or fell out and ran into a building. She then noticed that another man had gotten out of the car, after which the car "took off driving rather reckless."

Rudy Livengood testified that he was a good friend of defendant. On August 26, he first saw defendant at his own house around 9:30 a. m. They went to a tavern at some point during the day, but it was closed. Defendant and witness Livengood drank pretty heavily all day. In the afternoon, they went to defendant's house. Defendant's wife was upset about his drinking, and they argued. Defendant accused his wife of running around. Defendant had earlier remarked to Livengood that his wife was running around at the instigation of Dick Graham's wife. Defendant had never mentioned Dick Graham as the person who his wife might be seeing. After the argument, defendant made Livengood and his wife get into the green Oldsmobile with Livengood in the middle. As they were traveling along, defendant's wife jumped out and ran off. The next thing the witness recalls is being at home. He testified that he did not want to go in the car because he had never seen defendant act that way before and was afraid of him. The witness did not see a rifle in the car.

The State introduced a written statement given by defendant on August 29, 1974 shortly after his arrest. The defendant stated that on August 26 he drank wine with Rudy Livengood, returning to defendant's house around 5 p. m. His wife was mad because he had been drinking, and they argued. Rudy Livengood was angered by appellant's treatment of his wife and asked to be taken home. Defendant wasn't arguing with his wife about running around

with another man. "I wouldn't live with her if she ran around with another man we wasn't fighting about that I come in drunk and we always get to arguing she was afraid of me." They left, defendant refusing to let his wife drive, with Rudy sitting in the middle and the wife on the outside. His wife opened the door before they got to Rudy's place and jumped out. After Rudy got out, he drove around to look for his wife. He was driving his wife's green Oldsmobile. He then drove by Dick Graham's place and asked Graham if he wanted to go with him. Graham answered that he would have to finish feeding and wash up and put some clothes on. Defendant then stated that he wanted to show Graham his new rifle. The rifle holds "17 in the tube" and maybe "one more shot in the chamber." It had been lying on the floor of his car as he carried it with him most of the time. As defendant was getting the rifle out of the car, it started going off while Graham was standing there. ". . . it went off I don't know if it was stuck on the door or it just kept going off and he said something I looked over he was just laying there." Defendant was "scared to death" and threw the gun into his car and left. He went down the road and up a hill and got out of his car, taking the gun, running back into the trees. He kept going, leaving the rifle at a place where he fell, and spent most of the next day at a certain spot. On August 28, he got a ride back into town. Defendant did not know if his finger was on the trigger when the gun went off. Defendant was acquainted with Dick Graham. They might have had words before but never had a fight. His wife and Mrs. Graham were friends, having worked together at a factory, but defendant didn't know her too well. He knew Mrs. Graham's first husband real well. Defendant wasn't mad at Dick Graham.

An expert testified concerning the operation of a twenty-two semi-automatic rifle. He testified that there is no such thing as a fully automatic twenty-two rifle. A twenty-two semi-automatic rifle operates by reloading and cocking itself after each shot but requires a new pull of the trigger to

fire a new shot. He testified that he had experience with semi-automatics malfunctioning and becoming automatic but that in his experience, such a gun would jam on the fourth round so that only three bullets could fire by accident. He further testified that the bullet pattern from a twenty-two rifle malfunctioning into a wall at about ten feet would be one to four inches between each bullet.

Sergeant Murphy of the Highway Patrol testified that a twenty-two caliber slug was recovered from the victim. Dr. Sunderwith performed an autopsy upon the victim. The victim had been shot six times, in the buttocks area, in the area of the eleventh rib on the right side, under the right arm at the fifth rib, under the right arm at the third rib, in the right cheek and by the left ear. The cause of death was multiple bullet wounds, four of the six wounds being fatal.

The murder weapon was not recovered and, accordingly, was not in evidence.

Defendant presented no evidence.

Defendant attacks the sufficiency of the evidence to support a submission of either first or second degree murder and the sufficiency of the evidence to support the jury's verdict.

Defendant's complaint that it was error to submit an instruction on murder in the first degree must fail. "A defendant who has been convicted only of murder in the second degree may not successfully urge error in the giving of an instruction on murder in the first degree, even if the instruction is not sufficiently supported by evidence." *State v. Strong*, 339 S.W.2d 759, 765 (Mo.1960); *State v. Sprout*, 365 S.W.2d 572 (Mo.1963); *State v. Adams*, 497 S.W.2d 147 (Mo.1973).

Defendant urges that there was no evidence of intent to support a submission or a finding of guilty of second degree murder.

The record reveals the contrary to be true. Initially, there is direct evidence by defendant's own statement that he was holding the rifle when Dick Graham was shot. While that statement is exculpatory as to intent, the State is not bound by that portion of appellant's statement negating the required element of intent. *State v. Clark*, 494 S.W.2d 26 (Mo.banc 1973); *State v. Goacher*, 376 S.W.2d 97 (Mo.1964). The State showed that defendant had been drinking all day and that he had an argument with his wife a short time before the alleged murder. The fact of his wife's jumping from a moving vehicle gives rise to an inference that a violent dispute occurred in the car. He suspected his wife of being unfaithful and thought that the victim's wife had induced this behavior. Defendant was acting in an agitated and angry manner, causing a companion to be afraid, shortly before the shooting. He was seen hurrying into his house to get his rifle and then speed away within approximately thirty minutes of the alleged murder. There was evidence that the rifle used was a twenty-two rifle with automatic action, holding 17 shells. Defendant's theory of accident was controverted by the State's expert whose testimony was that no fully automatic twenty-two rifle exists, and that a semi-automatic twenty-two rifle would not fire more than three or four times if it malfunctioned and fired automatically. The victim was shot six times. The State further showed that the bullet pattern on the victim's body differed from that which would have resulted from the malfunctioning and automatic firing of a semi-automatic twenty-two rifle. There was also evidence of flight.

In considering the sufficiency of the evidence, this court must consider as true the evidence most favorable to the State and the favorable inferences reasonably to be drawn therefrom. *State v. Thomas*, 309 S.W.2d 607 (Mo.1958).

Intent may be inferred from the circumstances surrounding the killing. *State v. Sturdivan*, 497 S.W.2d 139 (Mo. 1973); *State v. Cuckovich*, 485 S.W.2d 16 (Mo.banc 1972). In determining intent, the jury can take into consideration the nature of the weapon used, the manner of using it, the results of its use and all of the related circumstances. *State v. Kopf*, 481 S.W.2d 7

(Mo.1972). The fact that defendant fled is also a circumstance indicating guilt. *State v. Burnley*, 480 S.W.2d 881 (Mo.1972).

The issue of the nature of the homicide as accidental or intentional turned on the credibility, weight and value of defendant's statement as against the evidence of the State and the reasonably favorable inferences to be drawn therefrom. *State v. Strong*, 339 S.W.2d 759 (Mo.1960). The jury found against the defendant on the issue of accidental shooting.

The expert testimony and the inference from it favorable to the State indicates the defendant actuated the trigger. The placement of the wounds in the light of the expert's testimony concerning the pattern created in an accidental discharge supports the same inference. Also consistent with a finding of an intentional shooting is the evidence of defendant's anger and dispute with his wife of sufficient import to cause her to leave the automobile while it was moving. The evidence that defendant returned to his home for the weapon and the manner of his operation of the car are also supportive of the inference of intentional shooting. The flight of the defendant was likewise for the jury to assess on the issue of intent. So considered, the jury could have reasonably found from the evidence that defendant intentionally shot Dick Graham. See *State v. Young*, 225 S.W. 908 (Mo.1920); *State v. Thomas*, 309 S.W.2d 607 (Mo.1958); *State v. Strong, supra*. Upon the jury finding of the intentional killing of a human being with a deadly weapon used upon a vital part of the body, a presumption of the requisite malice and premeditation arises. *State v. Small*, 344 S.W.2d 49 (Mo.1961); *State v. McCracken*, 341 Mo. 697, 108 S.W.2d 372 (1937); *State v. Goodwin*, 352 S.W.2d 614 (Mo.banc 1962), cert. denied 371 U.S. 915, 83 S.Ct. 262, 9 L.Ed.2d 174 (1962).

The issue of second degree murder was submissible on this record.

Defendant also urges error in submitting Instruction No. 7 on second degree murder and Instruction No. 8 on manslaughter in that they failed to follow the form required by MAI–Cr. This point was raised for the first time in the second amended motion for new trial, filed almost three months after trial. The amended motion being untimely preserves nothing for review. *State v. Tucker*, 451 S.W.2d 91 (Mo.1970); *State v. Mucie*, 448 S.W.2d 879 (Mo.1970), cert. denied, 398 U.S. 938, 90 S.Ct. 1842, 26 L.Ed.2d 271 (1970).

Defendant's next contention is that the testimony of George Smith as to his actions and his statements made to the chief of police were erroneously admitted because it constituted character evidence. The only evidence of character which the jury heard was the volunteered statement of George Smith after describing defendant's actions in getting his gun, "So I knew Elmo and in past experience with him I figured that somebody was going to get hurt." Counsel for defendant objected after this statement was made, and his objection was sustained. No further relief was requested.

To preserve error, a question must be objected to prior to the answer if it appears that the answer will be objectionable. If for some reason the objection is untimely, then the answer should be reached by a motion to strike. *State v. Tyler*, 306 S.W.2d 452 (Mo.1957); *State v. Johnson*, 483 S.W.2d 65 (Mo.1972); *State v. Graham*, 527 S.W.2d 936 (Mo.App.1975). Defendant cannot complain on appeal if he expresses apparent satisfaction with the action of the trial court, *State v. Bibee*, 496 S.W.2d 305 (Mo.App.1973); *State v. Platt*, 525 S.W.2d 637 (Mo.App.1975), nor can he complain without an adverse ruling, *State v. Holland*, 530 S.W.2d 730 (Mo.App.1975). Defendant obtained all of the relief which he requested and accordingly cannot now complain.

As to statements made to the chief of police, there is no basis for a claim of error. All questions which might have elicited any of George Smith's statements to Chief Clawson were timely objected to and the objections sustained. No further testimony in the nature of character evidence was

given. For the reasons stated above, the point is denied.

Defendant next argues that the trial court erroneously permitted the State to treat Rudy Livengood as a hostile witness, to ask leading questions and to impeach him without a sufficient foundation.

Where a witness is unwilling or unfriendly, especially if his testimony is important, the trial court may, in its sound discretion, allow leading questions. *State v. Crone*, 399 S.W.2d 19 (Mo.1966). A party should not be allowed to treat his own witness as hostile unless that party is surprised by the witness's answers and those answers, in effect, make the witness a witness for the other side. *State of Missouri v. Milton Feemster*, 544 S.W.2d 588 (Mo.App. 1976) [No. 37008, St. Louis District, filed October 26, 1976]. Rudy Livengood testified that he had known defendant for about five years and that they were good friends. He was also with defendant all day on the day of the homicide. Responding to questions about the events leading up to the homicide, he initially stated that Mrs. Woolford was not upset about their drinking and said nothing to defendant. At this point, the prosecutor expressed surprise, informing the trial court that the witness had previously told him that defendant and his wife were arguing. The court declared the witness hostile so that the State could cross-examine. The court also ruled that the prosecutor could show to the witness a copy of a previous statement given to the prosecutor for the purpose of refreshing the witness's recollection. The prosecutor, after first showing the witness his prior statement, proceeded to cross-examine.

The State did not improperly impeach Rudy Livengood as the prior statement was neither introduced into evidence nor read to the jury. Where a witness is forgetful or unwilling, it is not improper to show the witness a former written statement to refresh his memory. *State v. Renfro*, 408 S.W.2d 57 (Mo.1966).

Nor can it be said that the trial court was guilty of an abuse of discretion in allowing the State to lead this witness. The witness was a good friend of defendant, and the State was allowed to lead him when it became apparent that he was giving answers which the State had not expected based on previous interviews. In *State v. Sutton*, 454 S.W.2d 481 (Mo.banc 1969), the State was allowed to lead a witness without a showing of entrapment or hostility. The court noted that criminal cases have been reversed where there was obvious prejudice or a manifest abuse of discretion when the State was allowed to impeach or discredit its witness without a showing of artifice or entrapment. However, the court held that because the State's examination of the witness therein was not manifestly prejudicial, the trial court did not abuse its discretion. Here also, the cross-examination by the State of Rudy Livengood was not manifestly prejudicial, and in view of the witness's apparent contradiction of earlier statements and obvious reluctance to testify against a good friend, the trial court did not abuse its discretion in allowing the State to lead its own witness.

Defendant next urges that the testimony of the State's expert on guns was inadmissible because there was no evidence of the type of weapon used. While the timeliness of defendant's objections to this testimony is dubious, the argument is without merit.

Defendant correctly states the rule that expert opinion must be supported by a substantial factual evidentiary base. *State v. Johnson*, 504 S.W.2d 334 (Mo.App. 1973); *State v. Schmidt*, 530 S.W.2d 424 (Mo.App.1975). However, defendant incorrectly asserts no such base herein. The expert testified to the operation, malfunctioning and bullet pattern of a twenty-two semi-automatic rifle. There was evidence that a twenty-two caliber bullet was removed from the victim. Defendant's statement indicated that the gun was a rifle holding 17 rounds. This, in addition to the defendant's claim that the weapon fired several times without any mechanical intervention such as a lever or slide action, indicated that the weapon was a twenty-two rifle with semi-automatic action. The ex-

pert testified that there is no such thing as a fully automatic twenty-two caliber rifle which shoots continuously by a single pull of the trigger. The above evidence clearly provided a sufficient factual base to support the expert testimony.

Defendant was not prejudiced because the evidence of the type of bullet was introduced after the expert testified. *State v. Whipkey*, 361 Mo. 1008, 238 S.W.2d 374 (1951). Appellant's further contention of error in that the questions propounded were not in hypothetical form is not preserved, there having been no objection at trial on this basis. *State v. Atkins*, 494 S.W.2d 317 (Mo.1973).

Defendant next contends that the trial court committed error in admitting the autopsy testimony of Dr. Sunderwith because the autopsy was illegal and unauthorized in that it was authorized by the sheriff of Cedar County without statutory authority, Sections 194.115 and 58.451 RSMo 1969. Defendant cites no cases in support of his contention that an exclusionary rule applies to an illegal or unauthorized autopsy. The only Missouri case of any relevance is *State v. Vaughan*, 152 Mo. 73, 53 S.W. 420 (1899). Defendant therein argued that the testimony of the physician who performed the autopsy should have been excluded because the coroner failed to make a record of the inquest as required by law. The court disagreed, holding:

> "The fact that the coroner was required to make a record in no way affected the competency of Dr. Frye to testify to what he found upon his autopsy. The identical question was raised in *Com. v. Taylor*, 132 Mass. 261, and the supreme court of Massachusetts held it did not affect the competency of the physician, even though he proceeded without authority according to the laws of that state. Here there is not even a suggestion that Dr. Frye acted irregularly, or without authority, but it is conceded he acted at the instance of the coroner." l.c. 420.

The State cites cases from other jurisdictions which have held that evidence of an autopsy is not inadmissible because the autopsy was illegal or unauthorized. *People v. Franszkiewicz*, 302 Mich. 144, 4 N.W.2d 500 (1942); *State v. Ruggiero*, 93 R.I. 241, 174 A.2d 555 (1961). That issue need not be decided, for defendant has failed to preserve it for review.

Prior to the testimony of Dr. Sunderwith, counsel for defendant objected to any evidence of the autopsy on the ground that it was illegal and unauthorized *because no coroner's jury was impaneled*. This objection was overruled. Defendant apparently bases the point now raised on the testimony of Dr. Sunderwith which followed that the autopsy was performed at the request of the sheriff. However, no further objections to the autopsy evidence were made. "The trial court must be given an opportunity to rule upon an objection giving stated reasons for exclusion. And the point raised upon appeal must be based upon the theory of the objection as made at the trial," *State v. Lang*, 515 S.W.2d 507, 511 (Mo.1974). The point is denied.

Defendant's final point is that the trial court erred in overruling a motion to suppress his statement and in admitting the same into evidence. This error is based upon the alleged involuntariness of the statement and an argument that the statement admitted into evidence was not a complete copy of the questions and answers. This point was not raised until the first amended motion for new trial which was filed out of time. Furthermore, when the State introduced this statement, counsel for defendant expressly waived any objection on the grounds of involuntariness. The record clearly shows that defendant was afforded all constitutional safeguards. As to the completeness of the statement, no objection was made at trial. There was evidence that the statement was taken in shorthand by a stenographer and transcribed by her. The typewritten statement was then read and signed by defendant. Defendant offers no actual proof of its incompleteness and no effort is made to show

that any portion of the statement not read to the jury would have been favorable to the defendant. Even if portions of the statement were omitted, the burden is with defendant to show the nature of the omissions and the prejudice arising therefrom. Appellate courts will not interfere in the reception or rejection of evidence absent a showing of prejudice. This, of course, requires in the instance of evidence not in the record by means of testimony some offer of proof which permits an assessment of the offered testimony. No such offer appears in this record. *State v. Loahmann,* 58 S.W.2d 309 (Mo.1933); *State v. Washington,* 320 S.W.2d 565 (Mo.1959).

Judgment affirmed.

All concur.