**STATE of Missouri, Respondent,**

v.

**Edward Thomas COOK, Appellant.**

**No. KCD 29188.**

Missouri Court of Appeals,
Kansas City District.

Dec. 5, 1977.

Motion for Rehearing and/or Transfer
Denied Dec. 27, 1977.

Application to Transfer Denied
Feb. 8, 1978.

Kranitz & Kranitz, Hugh D. Kranitz, Ronald M. Sokol, St. Joseph, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P. J., and SOMER-VILLE and WASSERSTROM, JJ.

SOMERVILLE, Judge.

Two strangers were caught in a whirlpool of senseless events during the early morning hours of October 5, 1975, in Buchanan County, Missouri, resulting in the homicidal death of one and imprisonment of the other for fifteen years. One of the strangers, Edward Thomas Cook (defendant), was charged by information with murder in the second degree for killing the other stranger, Robert Allen Pistole (victim).

The charge was first tried to a jury in the court of Judge Frank D. Connett, Jr. and ended in a hung jury. Thereafter, defendant waived a trial by jury and the cause was submitted for trial to Judge Connett upon the following stipulation, "that the evidence which was adduced at the first trial in this matter will be presented to the court in the form of a transcript, with two additional stipulations[1], and waive any further hearing in the matter." Although neither party requested findings of fact and declarations of law, Judge Connett made the following general and special findings[2]

---

1. "The state and defense would stipulate that if Philip DeRoin were called to the stand, his testimony would be that at the time Robert Allen Pistole was shot, Philip DeRoin did not reach across in back or in front of the defendant."

"The other stipulation would be that in rebuttal to that testimony, your Honor, Mr. Cook, if called to the stand, would testify that during the jury deliberations in the first trial, Mr. DeRoin came up to Mr. Cook and stated that if he were called he would not tell the truth about what happened that evening."

2. Rule 26.01(c) provides in part: "In a case tried without a jury the court shall make a

which have the force and effect of the verdict of a jury [3]:

"This Court finds beyond a reasonable doubt that on the 5th day of October, 1975, in the County of Buchanan, State of Missouri:

1. That the defendant caused the death of Robert Allen Pistole by shooting him with a .22 caliber single-action revolver;

2. The revolver was not fired accidentally;

3. The defendant intentionally fired the revolver in the direction of the deceased;

4. That the defendant did this while in the act of exhibiting a deadly and dangerous weapon in a rude, angry and threatening manner in the presence of Robert Allen Pistole;

5. The defendant was not acting in lawful self-defense when he pointed or fired the revolver at the deceased;

THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED by the Court that the defendant Edward Thomas Cook is guilty of murder in the second degree and punishment is fixed by the Court at imprisonment in the State Department of Corrections for a term of 15 years."

Defendant's motion for a new trial was overruled, allocution was afforded, judgment was entered, and sentence was pronounced accordingly.

The facts, abstracted to the extent permitted by the points presented for review, will now be set forth. On the evening of April 4, 1975, the victim attended a dance in St. Joseph, Missouri, sponsored by the Citizen's Band Radio Club. Following the dance, the victim accompanied Gary Carpentier to the latter's home. At approximately 1:30 A.M. on the morning of April 5, 1975, the two men were talking on a citizen band radio which Carpentier had in his home. While doing so they were verbally abused by an unknown person using gutter language on the "C.B." channel they were operating on. An argument ensued between the victim and the unknown person over the "C.B." broadcast channel culminating in an agreement to meet at a service station on the northwest corner of Belt Highway and Mitchell "to settle the dispute."

Gary Carpentier and the victim drove to the service station to keep the prearranged rendezvous in Carpentier's 1977 maroon Vega station wagon. The station wagon was equipped with a "C.B." radio. Carpentier and the victim waited at the service station anticipating the arrival of a brown pick-up truck which they erroneously believed contained the verbal assailant. Carpentier and the victim waited in vain for the arrival of a brown pick-up truck. Defendant arrived at the service station driving a white 1966 Chevrolet. He was accompanied by Philip DeRoin and several other buddies. Neither defendant nor DeRoin identified DeRoin as the victim's verbal assailant. While at the service station the victim, in the presence of defendant and DeRoin, stated that he was going to put some "speed knots" on the head of the person who had been verbally abusing him "over the air". Several other motor vehicles with "whip" antennas arrived at the service station. A police officer who arrived ordered all of the vehicles which had gathered there to disperse. When the Vega station wagon occupied by the victim left the service station it was followed by the white 1966 Chevrolet driven by defendant.

Carpentier and the victim returned to Carpentier's home. After their arrival they noticed the white 1966 Chevrolet cruising through the neighborhood. This prompted them to monitor several channels on the "C.B." radio in Carpentier's home. After doing so they concluded that the victim's verbal assailant was an occupant of the white 1966 Chevrolet. Carpentier and the

general finding and may in addition, in his discretion, find the facts specially. . . ."

**3.** Rule 26.01(b) provides in part: "The defendant may, with the assent of the court, waive a trial by jury and submit the trial of any criminal case to the court, whose findings shall have the force and effect of the verdict of a jury. . . ."

victim again left the Carpentier home in the Vega station wagon. This time their destination was a bowling alley on the Belt Highway. As they traveled north on the Belt Highway they came in sight of the white 1966 Chevrolet which was also traveling north on the Belt Highway. They gave chase to the white 1966 Chevrolet. As they did so, it turned east off of the Belt Highway and onto Frederick Avenue. They too turned east onto Frederick Avenue and pulled up alongside the white 1966 Chevrolet. The victim was sitting in the right front seat of the Vega station wagon and defendant was driving the white 1966 Chevrolet. While the two vehicles were traveling east on Frederick Avenue, side by side, at a speed of approximately ten to fifteen miles per hour, the following occurred. The victim rolled down the window on the passenger side of the Vega station wagon and shouted, "You motherfuckers, you're going to get it now, you son-of-a-bitch." Carpentier and the victim had no weapons. Defendant reached under the seat of his car and picked up a loaded .22 caliber single action revolver which he owned. Holding the revolver by the butt, defendant stuck it out the window. The revolver was discharged and a bullet fired from it struck and killed the victim. After the fatal shot was fired, defendant "floorboarded" his car and fled the scene. He was eventually found in a service station "hiding under a mattress".

According to defendant he didn't mean to shoot the victim, "the gun just went off". He claimed he didn't have his finger on the trigger when the revolver fired and that it was discharged accidentally. Defendant further testified that while holding the revolver outside the window, DeRoin, who was sitting in the front seat of defendant's automobile, placed his arm in front of defendant's arm and then pulled it back and as he did so the revolver discharged. It is appropriate to note at this point that the parties stipulated that if DeRoin "were called to the stand, his testimony would be that at the time Robert Allen Pistole was shot, Philip DeRoin did not reach across in back or in front of the defendant."

A "firearm expert" called by the state testified that the weapon which fired the fatal shot was a single-action revolver; that it had five "hammer positions", the "fired" position, the "quarter-cocked" position, the "half-cocked" position, the "three-quarter-cocked" position, and the "full-cocked" position; that it had to be in the "full-cocked" position before it could be fired by means of pulling the trigger. He also testified that when the hammer was in the "fired" position, striking the muzzle or "back portion" of the hammer "with a sufficient amount of force" could cause the gun to fire. Although the witness demonstrated to the jury at the first trial what constituted a "sufficient amount of force", it is not reflected by or preserved in the record.

Six points are raised by defendant on appeal. In varying degree they are involved, lengthy, and vacillatory in terms of frame of reference. In several instances they are negatively posed. This court has undertaken the concededly difficult task of compressing and restating them for purposes of this opinion. Doing so has produced the following results. One: (a) the evidence is insufficient to support the trial judge's finding that defendant intentionally fired the revolver; and (b) under all the evidence defendant, as a matter of law, was acting in lawful self-defense when he fired the revolver at the victim. Two: (a) the evidence is insufficient to support defendant's conviction for conventional second degree murder because of the existence of provocation which reduced the homicide to manslaughter; and (b) the evidence is insufficient, generally speaking, to prove, and the trial court failed to find, all the requisite elements of conventional second degree murder. Third: As the general and special findings made by the trial judge show that defendant was found guilty of second degree felony murder, the information upon which defendant was tried failed to vest the trial judge with jurisdiction because it failed to allege an underlying felony. Four: The guilty verdict, as connoted by the general and special findings of the trial judge, is so vague and ambiguous that it

would not bar defendant's subsequent prosecution for an underlying felony.[4] Five: Convicting defendant of second degree felony murder on the basis of a felony which was an integral part of the homicide "eviscerated" his defense of provocation and "negated" the requisite elements of conventional second degree murder. Six: As the general and special findings of the trial judge failed to affirmatively find all the requisite elements of conventional second degree murder, defendant was acquitted of conventional second degree murder and therefore entitled to have his conviction reversed outright or, at most, reversed and remanded for a new trial solely on manslaughter.

■ Defendant, in a perfunctory manner, variously attributes two meanings to the guilty verdict returned by the trial judge. In advancing certain claims of error, he treats it as finding him guilty of conventional second degree murder. With equal facility, in advancing other claims of error, he treats it as finding him guilty of second degree felony murder. The dichotomous approach taken by defendant toward the guilty verdict has injected considerable confusion into the collective points of error asserted on appeal and has placed them in a dispositional dilemma. Determination of just which of the two versions of homicide the trial judge found defendant guilty of will eliminate the confusion, resolve the dilemma, and narrow the issues on appeal.

The trial judge's special finding that defendant shot the victim "while in the act of exhibiting a deadly and dangerous weapon in a rude, angry and threatening manner in the presence of Robert Allen Pistole [victim]" is stressed by defendant as being conclusively indicative of a guilty verdict of second degree felony murder because the conduct outlined in quotes constitutes a felony proscribed by Section 564.610, RSMo 1969. Defendant weights this special finding out of all proportion with the other special findings and ultimate verdict returned by the trial judge. Other special

findings made by the trial judge, i. e., that the revolver was not fired accidentally and that defendant intentionally fired the revolver at the victim, would be wholly immaterial and superfluous if the verdict were to be construed as finding defendant guilty of second degree felony murder. *State v. Burnett*, 365 Mo. 1060, 293 S.W.2d 335, 343 (banc 1956), affirming a conviction for first degree felony murder, held that it was immaterial that the fatal shot may have been fired unintentionally or accidentally. See also *State v. Beal*, 470 S.W.2d 509, 513 (Mo. banc 1971). Basic logic transposes this principle to second degree felony murder cases and common sense effects the same result. Moreover, the trial judge's special finding that defendant intentionally fired the revolver at the victim, as opposed to the revolver being accidentally fired, constituted a finding of an essential element of conventional second degree murder, namely, willfulness. As oft stated, the requisite elements of second degree murder are willfulness, premeditation and malice aforethought. *State v. Randolph*, 496 S.W.2d 257 (Mo. banc 1973). In the context of murder, willfulness is defined as "intentionally" or "knowingly". *State v. Marston*, 479 S.W.2d 481, 484 (Mo.1972). As aptly put in *State v. Woolford*, 545 S.W.2d 367, 372 (Mo.App.1976), "[u]pon the . . . finding of the intentional killing of a human being with a deadly weapon used upon a vital part of the body, a presumption of the requisite malice and premeditation arises."

An even more compelling reason exists to conclude that the trial judge found defendant guilty of conventional second degree murder and not second degree felony murder. The salient facts disclose that no appreciable amount of time elapsed between the time defendant stuck the revolver out the window of the car and the shooting of the victim. This being the case, defendant's display of the revolver in a "rude, angry and threatening manner" was such an integral part of the consummated homi-

4. According to defendant, one example being exhibiting the revolver in a rude, angry and

threatening manner in the presence of the victim in violation of Section 564.610, RSMo 1969.

cide that it lost its separate identity. Contrary to defendant's contention, it did not constitute a separate underlying felony proscribed by Section 564.610, supra, but was part and parcel of the homicide itself. In those countless homicide cases where deadly weapons are wielded in an unconcealed manner to inflict mortal wounds there is necessarily a period of time, fleeting in some, longer in others, when the deadly weapon is displayed in a rude, angry and threatening manner in the victim's presence. The attendant physical realities of such offenses inexorably dictate this result. Exhibiting the revolver in a rude, angry and threatening manner in the presence of the victim in the instant case was of such a fleeting nature that it was a distinct part of and inseparably related to the overall physical act required to perpetrate the homicide. Common sense dictates that flourishing the weapon in the manner heretofore mentioned and killing the victim constituted a single indivisible transaction. Such being the case, no distinct or separate underlying felony existed upon which to predicate application of the second degree felony murder rule. To hold otherwise would give the felony murder rule a diabolic twist, extend its application beyond all national bounds, and pervert the very purpose which it was legally designed to serve. Basing the result heretofore reached upon the concept that only a "single indivisible transaction" was involved finds support in a number of other jurisdictions. See: *People v. Ireland*, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (banc 1969); *People v. Moran*, 246 N.Y. 100, 158 N.E. 35 (1927); *State v. Branch*, 244 Or. 97, 415 P.2d 766 (banc 1966); and *State v. Essman*, 98 Ariz. 228, 403 P.2d 540 (banc 1965).

As noted in *Cook v. State*, 511 S.W.2d 877, 879 (Mo.App.1974), with respect to jury verdicts "the controlling object is to learn the intent of the jury", and in ascertaining the jury's intent their verdict "should be liberally construed" and should not be tested "by technical rules of construction." No reason comes to mind why the same should not likewise be applicable to verdicts in court tried cases. When the facts at hand are juxtaposed with the special findings made by the trial judge, in an atmosphere composed of the various principles heretofore mentioned, it becomes apparent that the verdict is not as rife with doubt as defendant would have all believe. Concomitantly, this court finds that the verdict which defendant faults does not have to be torturously construed to arrive at the conclusion that the trial judge intended to and did find defendant guilty of conventional second degree murder.

■ Moving on from the digression occasioned by the necessity of construing the verdict returned by the trial court, attention now focuses on the points of error asserted by defendant. Defendant's contention that the evidence was insufficient to support the trial judge's finding that he intentionally fired the revolver rests on his exculpatory testimony that the revolver fired accidentally. Defendant conveniently ignores the inherent weakness of this contention—the prerogative possessed by the trier of the facts to disbelieve and reject defendant's exculpatory testimony. *State v. Rose*, 325 S.W.2d 485, 487 (Mo.1959); *State v. Love*, 546 S.W.2d 441, 455 (Mo.App. 1976); and *State v. Garrett*, 510 S.W.2d 203, 206 (Mo.App.1974). On the other hand, the trial judge could reasonably find from the collective import of the following evidence that defendant intentionally fired the revolver: (1) defendant reached under the driver's seat of his car and grabbed a loaded revolver which he kept there; (2) holding the revolver by the butt, he stuck it out the window and pointed it toward the victim; (3) the revolver was fired; (4) nothing struck the revolver while it was being held out the window which would cause it to fire accidentally; and (5) the bullet fired from his revolver struck the victim in a vital area and caused his death.

■ Regardless of the patent inconsistency between "accidental" or "excusable" homicide and self-defense,[5] defendant con-

---

5. *State v. Hale*, 371 S.W.2d 249 (Mo.1963); and *State v. Malone*, 301 S.W.2d 750 (Mo.1957).

tends that he was entitled to acquittal as a matter of law on the ground of self-defense. The absence of aggression or provocation on the part of an accused, a real or apparent apprehension on his part of the necessity to kill in order to avoid great bodily harm or being killed, the existence of reasonable cause to support such apprehension, the doing of everything in his power, consistent with his own safety, to avoid the danger confronting him and to avert the necessity of taking the life of another, and a duty to retreat, if retreat be practicable, are the constituent requirements of self-defense. *State v. Jackson*, 522 S.W.2d 317, 319 (Mo.App.1975), and cases cited therein. When evidence touching upon them is contradictory or of such a character that different inferences might reasonably be drawn, it is up to the trier of the facts to resolve whether an accused acted in self-defense. *State v. Hammonds*, 459 S.W.2d 365, 368 (Mo.1970); *State v. Hicks*, 438 S.W.2d 215, 219 (Mo.1969); and *State v. Vincent*, 321 S.W.2d 439, 442 (Mo.1959). The trial judge could reasonably find that defendant and his compatriots provoked the confrontation that resulted in the victim's death, and that defendant fell woefully short of doing everything within his power, consistent with his own safety, to avoid the confrontation and avert killing the victim. Defendant and his compatriots had numerous opportunities to "retreat" to the safety of their individual homes throughout the course of the early morning hours in question. Instead of doing so, they chose to continue to incite trouble and went out of their way looking for it. Moreover, the absence of any weapons possessed by the victim or the driver of the car he was riding in, coupled with the physical locations of the defendant and the victim in separate moving automobiles, substantially negates any basis for any real or apparent apprehension on defendant's part that it was necessary to kill the victim in order to avoid being killed.

Defendant's claim that the evidence discloses that he was provoked into killing the victim, thereby reducing the homicide to manslaughter, as a matter of law, is equally misplaced. The only provocation which defendant has to rely upon was verbal. This state has repeatedly held that verbal provocation is insufficient to reduce a proven case of second degree murder to manslaughter. *State v. Hubbard*, 484 S.W.2d 224, 226 (Mo.1972); *State v. Mosley*, 415 S.W.2d 796, 799 (Mo.1967); and *State v. Taylor*, 309 S.W.2d 621, 624 (Mo.1958).

Defendant's attack upon the sufficiency of the evidence to prove, and the trial court's failure to find, all the requisite elements of conventional second degree murder is, in a limited sense, directly akin to his earlier contention that the victim was shot accidentally rather than intentionally. The trial judge could, and obviously did, reasonably find that defendant intentionally killed the victim by means of a deadly weapon used upon a vital part of the latter's body. It is appropriate at this point to reiterate the established principle that by reason of certain permissible inferences, a submissible case of conventional second degree murder is made when the evidence discloses the intentional killing of a human being by another with a deadly weapon used upon a vital part of the victim's body. *State v. McQueen*, 399 S.W.2d 3, 6 (Mo. 1966); *State v. Goodwin*, 352 S.W.2d 614, 619 (Mo. banc 1962), cert. denied 371 U.S. 915, 83 S.Ct. 262, 9 L.Ed.2d 174 (1962); *State v. Majors*, 329 Mo. 148, 44 S.W.2d 163, 167 (1931). The foregoing adequately disposes of defendant's attack upon the sufficiency of the evidence to prove, and the trial court's failure to find, all the requisite elements of conventional second degree murder. Particularly so as "a presumption of the requisite malice and premeditation" in the context of second degree murder "arises" upon a finding that there was an intentional killing of a human being with a deadly weapon used upon a vital part of the body. *State v. Woolford*, supra, at 372.

The frame of reference for defendant's third and fifth points is that the trial court found him guilty of second degree felony murder, and the frame of reference for his fourth point is that the verdict is so vague

and ambiguous that it is impossible to tell whether the trial court found him guilty of conventional second degree murder or second degree felony murder. Having concluded that the trial court found defendant guilty of conventional second degree murder, his third, fourth, and fifth points are rendered academic.

Having heretofore concluded that the general and special findings and verdict returned by the trial court adequately constituted a finding that defendant was guilty of conventional second degree murder, defendant's sixth and final point is minus a base from which to forge any ground for relief.

Judgment affirmed.

All concur.